THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GARY SUMMERS, Defendant-Appellant.

First District (5th Division)    No. 79-2396

Opinion filed September 4, 1981.

James J. Doherty, Public Defender, of Chicago (Karen A. Popek, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Dean C. Morask, and Paula Carstensen, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendant was convicted of murder and sen-

tenced to 14 years to 14 years and a day. On appeal, he contends that the trial court erred in denying motions to quash his warrantless arrest and to suppress statements and evidence, and that he was not proved guilty beyond a reasonable doubt.

A pretrial hearing on defendant's motion to quash his arrest and to suppress evidence was conducted at which police officer Craig Cegielski testified, in pertinent part, that at about 7 a.m. on September 30, 1977, he and his partner, Officer Crescenzo, went to the apartment of the victim to investigate her death; that when they arrived, it appeared that she had been sexually attacked since her nude body was lying face down on the floor with some fecal matter on the small of her back, with evidence in the room of a struggle; that he was told by an evidence technician at the scene that a fingerprint suitable for comparison was found on an empty package of Kool cigarettes found lying on a coffee table near the victim's body; that one of her two young children said her mother was not home when they went to bed the previous night after watching a television show which ended at 10 p.m.; that at the crime scene, he spoke with defendant and his wife, who told him that they were trying to place the victim's children in the house of a relative or friend; that later, at the police station, George Turner (the victim's brother and brother-in-law of defendant) told him that defendant was a friend of the victim and that he had previously been arrested for rape and for attempting to burn down his mother-in-law's house; that following this conversation defendant's fingerprints, which were on file with the police department, were taken to the crime lab to be compared with the print found on the cigarette package recovered from the victim's apartment; that shortly thereafter, he and his partner received a radio message that the print from the package of cigarettes matched one of defendant's fingerprints, and they went to the residence of defendant's mother-in-law where defendant was placed under arrest at about 4 p.m. (on September 30); and that neither he nor his partner possessed an arrest warrant.

Officer Cegielski also testified that defendant was advised of his constitutional rights en route to the police station and again in an interview room at the station; that defendant said he had been out drinking with Terry Jackson and Bill Ford; that they arrived home about 2 a.m.; and that he (defendant) stayed home until 7 a.m., when a friend told him of the victim's death. The officer further testified that Terry Jackson was then interviewed and substantiated defendant's statement, except she said that after they returned from the tavern, defendant did not stay home but left about 3 a.m. and had not yet returned home when she fell asleep about 4:30 a.m.; that defendant was then shown the keys found in the victim's apartment and he said that he had never seen them before; that later, defendant freely and voluntarily signed a consent to search form

and, at his apartment, the officers recovered a maroon T-shirt which Terry Jackson later identified as the one defendant was wearing that night; and that he (Cegielski) obtained from defendant the shoes and undershorts he was wearing and sent them to the crime lab. The court ruled that there was probable cause for the arrest, and the motion to quash and suppress evidence was denied.

Subsequently, there was a hearing on defendant's separate motion to suppress statements and evidence which essentially challenged the voluntariness of defendant's statements following his arrest. Both Cegielski and Crescenzo testified that defendant had been advised of his constitutional rights and had not requested that a lawyer be present; that during the interview, defendant consented to a search of his apartment; that the consent to search form was read to him, which he then signed. Paul Linton, an Assistant State's Attorney, testified that he also advised defendant of his constitutional rights and questioned him for about one hour. All three witnesses stated that defendant was not handcuffed, that they spoke in normal conversational tones, and that defendant was not threatened or abused in any manner. Defendant presented no witnesses, and the court denied the motion ruling that the consent was voluntary.

At trial, Terry Jackson (first cousin to the victim and to defendant's wife) testified for the State that on September 29 at 11 p.m., she, defendant, and Billy Ford went to a tavern near defendant's home where they stayed until 2 a.m.; that as they were walking back to defendant's apartment, defendant dropped some keys; that one key she saw resembled one of those found at the crime scene; that when she said he had dropped the keys, defendant picked them up; that he was wearing a maroon T-shirt (State's exhibit No. 20) and "suede-like" shoes (resembling State's exhibit No. 19); that they arrived at the apartment soon thereafter, and at about 3 a.m. defendant left; that when she went to sleep at about 4 a.m., he had not yet returned; and that the next time she saw him was 7 a.m. on September 30.

Vernon Williams (the victim's boyfriend) testified for the State that at about 6 a.m. on September 30 he went to the victim's apartment; that he entered the living room where he found her body lying face down; that the room was in a state of disarray, and there were a couple of loose keys and change on the floor lying near the victim's body; and that shortly thereafter, when police officers arrived, he went to defendant's apartment.

Officer Isadore Williams testified that in the early morning of September 30, he arrived at the victim's apartment building and that, after talking to Vernon Williams outside, he and his partner entered the victim's living room where they found a nude female body lying face

down on the floor in a pool of blood, with a kitchen utensil penetrating her throat.

Officer Thomas Ginelly, a mobile unit technician, testified that he and his partner took about 18 photographs of the crime scene (which were entered into evidence); that they found one key on the floor near the victim's head and another key on a shelf at the base of the coffee table in the living room; and that fingerprint impressions were found on and lifted from the cellophane wrapping on an opened package of Kool cigarettes found on top of the coffee table.

Officer John Boyle testified that he and his partner went to a gas station, where defendant had worked until one week prior to the victim's murder, and determined that one of the keys recovered from the crime scene opened the front door of the station; that they later found that the other key recovered fit the front door lock of defendant's apartment; and that they apprised Officers Crescenzo and Cegielski of their findings.

Officer Crescenzo testified, in pertinent part, that after the arrest defendant told him and his partner, Officer Cegielski, that he had been out drinking the previous night with Terry Jackson and Billy Ford until about 2 a.m. and then returned home, where he stayed until 7 a.m. at which time Vernon Williams informed him of his sister-in-law's death; that when asked to identify two keys found at the scene of the crime, defendant said he had not seen them before; that after defendant consented to a search of his apartment, a maroon-colored T-shirt (State's exhibit No. 20) was recovered therefrom; that shortly thereafter, he and his partner told defendant that one of the keys recovered from the crime scene unlocked a gas station door where defendant was previously employed and that the other key opened defendant's apartment door, but defendant again declared he had never seen the keys before; and that prior to defendant's transfer to a detention facility, his shoes (State's exhibit No. 19) and undershorts were taken from him.

Certain testimony from defendant's first trial (which had resulted in a mistrial) was entered into evidence by stipulation. At the initial trial, Officer Thomas Krupowicz, a certified latent fingerprint examiner, testified that three latent fingerprints lifted from the package of cigarettes found on the coffee table at the scene of the crime matched the print of one of defendant's fingers, and that he could not tell how long defendant's prints had been on the package. Dr. Teas, a deputy medical examiner, testified that the cause of death, which occurred sometime between 3 a.m. and 10:57 a.m., was a stab wound. Bernadette Kwack, a microanalyst for the police department, testified that both the victim and defendant had type A blood, although their subgroup factors differed; that she found minute specks of type A human blood on the inside portion of the

shoes seized from defendant, but she was unable to determine the subgroup factor of the blood; that traces of blood were found on the maroon T-shirt, but she could not ascertain whether the blood was of human or animal origin; that minute specks of human blood were found on the fly area of defendant's undershorts, but the amount was insufficient for a determination of its type; that spermatozoa were also found on the undershorts; and that human spermatozoa were found in the victim's vagina and rectum. Assistant State's Attorney Paul Linton testified that during his questioning defendant acknowledged that the keys found at the crime scene could have been his. Finally, it was stipulated that Dr. Teas told defendant's attorney that the time of the victim's death was between 11 a.m. September 29 and 10:58 a.m. September 30.

OPINION

Defendant first contends that his warrantless arrest should have been quashed because probable cause was lacking. In considering a ruling upon a motion to suppress, a reviewing court may consider any evidence during trial which assists in establishing the legality of the arrest. (*People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808; *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121.) At trial, Officer Crescenzo testified that although the living room of the victim's apartment was in disarray the remainder of the apartment was fairly neat, and he characterized the condition of the empty cigarette package discovered at the scene of the crime as "crupled." Additionally, photographs of the crime scene, admitted into evidence at trial, indicate that no apparent damage had been done either to the inside or outside of the steel frame door to the victim's apartment; that the cigarette package, as well as scattered chess pieces, were on top of a chess board on the coffee table in the victim's living room; and that the victim's body was found lying flat on its stomach with legs apart.

We further note that the determination of whether probable cause for an arrest exists in a specific instance depends upon the totality of the facts and circumstances known to the officers when an arrest is made (*People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228, *cert. denied* (1980), ____ U.S. ____, 66 L. Ed. 2d 467, 101 S. Ct. 564), and it is present if a reasonable and prudent person in possession of the knowledge which has come to the arresting officer would believe that the person to be arrested had committed a crime (*People v. Denham* (1968), 41 Ill. 2d 1, 241 N.E.2d 415, *cert. denied* (1969), 394 U.S. 1006, 22 L. Ed. 2d 784, 89 S. Ct. 1605). However, in deciding the question of probable cause, we deal with probabilities, the factual and practical considerations of everyday life on which reasonable persons, not legal technicians, act (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280), and, in making such determination,

hearsay evidence may be considered (*People v. Sakalas*). Moreover, the court's finding of probable cause will not be disturbed unless manifestly erroneous. *Clay.*

Defendant maintains that the fingerprint of an accused found at the crime scene is insufficient of itself to sustain a finding of probable cause unless the fingerprint could have been impressed only at the time the crime was committed. We note, however, that in *People v. Rhodes* (1981), 85 Ill. 2d 241, 249, *rev'g People v. Van Zant* (1980), 84 Ill. App. 3d 355, 405 N.E.2d 881, the court stated:

> "In order to sustain a conviction solely on fingerprint evidence, fingerprints corresponding to the fingerprints of the defendant must have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that the fingerprints were impressed at the time the crime was committed."

In *Rhodes*, a defendant was convicted of burglary solely on the basis of evidence of a latent fingerprint, matching his, which was lifted from a clock radio. The complainant testified that the radio rested on a chair in his bedroom prior to the break-in and stood on the kitchen table after the intrusion. Despite the absence of evidence establishing the age of the fingerprint or proof that the radio ever left the complainant's home, the supreme court reversed the appellate court and reinstated defendant's conviction, concluding that "the evidence reveals that the defendant's fingerprint left on the clock radio could only have been impressed at the time of the commission of the offense." 85 Ill. 2d 241, 251.

██ Turning to the instant case and bearing in mind that the evidence required to establish probable cause is less than is necessary to prove guilt beyond a reasonable doubt (*People v. Williams* (1979), 79 Ill. App. 3d 817, 398 N.E.2d 1099), we believe *Rhodes* is analogous. Here, the arresting officers knew that defendant's fingerprint was impressed in the immediate vicinity of the crime on a portable object—a cigarette package. It appears to us that they could have drawn a reasonable inference that the fingerprint was impressed recently, because (a) an empty and crumpled cigarette package would not have remained long in an apartment which, other than the state of disarray in the living room, was relatively neat; and (b) the package found among some toppled chess pieces on top of the playing area of a chess board on the coffee table in the living room could have been there only a short time if chess was played. Thus, under the *Rhodes* reasoning, it appears that the officers could have formed a reasonable belief that defendant committed the offense, and thus there was probable cause to arrest.

██ In any event, fingerprint evidence did not form the sole basis for probable cause. Prior to the arrest, the arresting officers knew that there

was no damage to the door of the victim's apartment and thus could infer that entry thereto was not forced. This inference, coupled with the officers' knowledge that the victim arrived home after 10 p.m. and was killed before 7 a.m. the next day, indicates that the offender was someone known to the victim. Additionally, the officers knew that when the victim's body was discovered it was nude, lying face down on the floor with legs apart, and that there was fecal matter on the small of the victim's back. From those facts, they reasonably could conclude that there had been anal penetration of the victim, indicating that her assailant was male. Moreover, the officers were apprised by the victim's brother that defendant was a friend of his sister, which information was corroborated by the officers' own earlier encounter with defendant when he and his wife stated that they were trying to place the victim's children in the home of a friend or relative. Two others, the victim's former husband and her boyfriend, were also suspects, but their whereabouts had been accounted for that evening by the police. Therefore, on the basis of the totality of the facts and circumstances known to the arresting officers, we cannot say that the trial court's finding was manifestly erroneous.

We now turn to defendant's contention that his guilt was not proved beyond a reasonable doubt because "the totally circumstantial evidence was insufficient." We disagree.

■■ Where a conviction rests solely upon circumstantial evidence, as here, the guilt of the accused must be so thoroughly established as to exclude every reasonable hypothesis consistent with defendant's innocence. (*People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753.) However, the State need not prove guilt beyond any possibility of a doubt (*People v. Murdock* (1971), 48 Ill. 2d 362, 270 N.E.2d 21, *cert. denied* (1971), 404 U.S. 957, 30 L. Ed. 2d 274, 92 S. Ct. 323), nor must each link of the chain of circumstances of the State's case establish defendant's guilt beyond a reasonable doubt (*People v. Marino* (1970), 44 Ill. 2d 562, 256 N.E.2d 770). Rather, it is sufficient if all of the evidence, taken as a whole, satisfies the trier of fact beyond a reasonable doubt of the accused's guilt. *People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.

Defendant essentially attempts to discredit the State's case by attacking the probative value of each piece of evidence in isolation from the other evidence. However, it appears that the proof, taken as a whole, is sufficient to establish defendant's guilt beyond a reasonable doubt. First, defendant's fingerprints were impressed on a crumpled package of cigarettes found on a chess board located on the coffee table in the victim's living room near the victim's body. In view of the crumpled condition of the package and the otherwise neat condition of the apartment, the court reasonably could conclude that the package had recently been left in that location. Second, two keys were discovered near

the victim's body—one of which fit the lock to the door to defendant's apartment and the other being the key to the front door of a gas station where defendant was employed until about one week before the victim's death. Terry Jackson testified that at around 2 a.m. defendant dropped a couple of keys as she, defendant, and Billy Ford were walking from a tavern to defendant's apartment, and that the keys were similar in color to those found at the crime scene. Moreover, according to Assistant State's Attorney Linton, defendant admitted to him that the keys found near the victim's body could have been his. Although Officer Crescenzo testified that he had been present during Linton's entire interrogation of defendant and that he did not hear such a statement, it is significant in this regard that the trier of fact is free to accept the testimony of one prosecution witness over the conflicting testimony of another. (See *People v. Rosa* (1981), 93 Ill. App. 3d 1010, 418 N.E.2d 124.) Third, the laboratory analysis of certain items of defendant's clothing further linked him to the crime. As regards the shoes defendant was wearing when he was arrested—which Jackson testified resembled those he was wearing when they were out drinking—laboratory tests revealed the presence of type A human blood (the blood type of both defendant and the victim) on the inside portion. The maroon T-shirt which, according to Jackson, defendant was wearing the early morning in question, was found to have traces of blood thereon. In addition, according to laboratory analysis, specks of human blood were found in the fly area of the undershorts defendant was wearing when he was arrested, and spermatozoa were also found on the shorts. This scientific evidence is especially incriminating in view of the testimony of Bernadette Kwack that spermatozoa were found in the victim's vagina and rectum and the fact that the victim's body was discovered in a pool of blood. Fourth, based upon photographs of the door to the victim's apartment showing no signs of damage thereto, the court reasonably could infer that entry was not forced and thus could also conclude that the assailant was known by the victim. Fifth, defendant had the opportunity to commit the crime. It appears that the victim's death took place after 11 a.m. September 29 and, according to Vernon Williams' testimony, before 6 a.m. September 30. Jackson testified that defendant left his apartment at 3 a.m. and had not returned by 4 a.m., which refuted the alibi defendant gave police officers—that he returned home from drinking at 2 a.m. and did not leave until 7 a.m.

For the foregoing reasons, the judgment appealed from is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.