THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANGELO SANCHEZ, a/k/a Angel Sanchez, Defendant-Appellant.

First District (5th Division)    No. 80-1496

Opinion filed June 4, 1982.—Rehearing denied July 21, 1982.

Ralph Ruebner and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and John D. Cecilian, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant Angel Sanchez was found guilty of murder, felony murder, and armed robbery. (Ill. Rev. Stat. 1977, ch. 38,

pars. 9—1, 18—2.) He was sentenced to 60 years imprisonment for murder and 30 years for armed robbery, both sentences to run concurrently. On appeal he argues that (1) his arrest was illegal because it lacked probable cause and therefore all evidence seized from his person and apartment should have been suppressed; (2) the consent to search form he signed was not voluntarily executed because of his inability to understand English; and (3) his right to a fair trial was unduly prejudiced by the prosecution's inflammatory comments during closing arguments. We affirm.

On April 26, 1978, Linda Tremaine's corpse was discovered in her apartment on North Sheridan Road in Chicago. Defendant Angel Sanchez was arrested on April 27, 1978, at 10 p.m. and charged with felony murder, murder, and armed robbery.

Defense counsel filed two motions to suppress on May 16, 1979. One motion was to suppress illegally seized evidence and the other motion was to suppress Angel Sanchez' statement pertaining to the crime.

*Motion to Suppress Evidence*

On June 21, 1979, the trial court heard evidence and arguments on defendant's first motion. The following testimony was given.

Investigator Chris Grogman of the Chicago Police Department was the first witness called by the defense. He testified that when he arrested defendant at 2452 West Belmont at 10 p.m. on April 27, 1978, he had no warrant and defendant was not acting in violation of any statutes. Grogman also admitted that certain items of property were taken from Sanchez and from his home after his arrest.

The State then called Investigator Grogman as its witness. He had been assigned to the Tremaine case at 8:30 p.m. on April 26, 1978. First he went to the victim's apartment and viewed the body and the premises. The apartment was in total disarray. The victim was nude and partially covered with a sheet on the bed. She had been stabbed numerous times in the chest and a telephone cord was wrapped around her neck. A knife was on the floor next to the bed. A saucer with red wine in it was also next to the bed. Fingerprints were taken from the scene.

After they left the apartment, Grogman and his partner, Investigator John Durkin, spoke with Linda Turney at 8 p.m. on April 27. She told them that she had observed Linda Tremaine with Angel Sanchez during the late evening hours of April 25, 1978, at the Peanut Barrel Tavern near Sheridan and Leland. Turney saw that defendant was accompanied by four male Latinos, but he left the bar with Linda alone. Linda Turney identified defendant by name. She also told Grogman that she saw the deceased with defendant at 2 a.m. on April 26 at the Paradise Lounge,

which is located in the same building as Linda Tremaine's apartment at 4826 North Sheridan.

Grogman and his partner next interviewed Cindy Madison, an employee of the Paradise Lounge. They spoke to her at 9:15 p.m. on April 27, 1978. She said that when Linda Tremaine's male companion attempted to buy wine, Madison would not sell it to him because he had no identification. Linda Tremaine then paid for the wine and gave it to him. Cindy Madison gave the investigators a general description of the man who had accompanied Linda Tremaine but did not know his name.

Investigator Grogman further testified that after he had talked to Cindy Madison, he returned to the Peanut Barrel, where Linda Turney came up and pointed out a man who stood nearby at the corner of Sheridan and Leland. She said "That's Angel Sanchez." Grogman walked over to the man, identified himself as a police officer and asked his name. He replied, "Angelo Sanchez." Grogman asked him for identification, which he did not have, and then told him he was investigating a murder and would like to talk to him further. Sanchez was wearing a woman's wristwatch and ring, later identified as belonging to Linda Tremaine.

Subsequently, Grogman and his partner read him the *Miranda* warnings and took him to the police station. Sanchez told Grogman that he understood his constitutional rights before agreeing to answer some questions.

During cross-examination, Grogman testified that when he first visited Tremaine's apartment, before apprehending the defendant, he did not know who had been in the apartment during the murder. At the time of Sanchez' arrest the police were not yet aware that fingerprints lifted at the murder site belonged to defendant.

On June 22, 1979, Investigator Thomas Stevens testified for the prosecution. He had been assigned to the case on April 28, 1978. Stevens identified a "permission to search" form which had been signed by Angelo Sanchez, Tony Torrez, and Investigator Walter Kline. Stevens testified that Sanchez read the form and indicated that he understood. Afterward, Torrez, a civilian detention aide, orally translated the form into Spanish and defendant reiterated that he understood it before signing. Torrez went off duty and another Spanish-speaking civilian aide, Alicia Rivera, wrote a summary of the consent form in Spanish. Sanchez read and signed the summary, which gave the police permission to enter his apartment. Stevens then went to defendant's apartment and removed some items. He also testified that he and defendant had spoken in English.

On cross-examination Officer Stevens testified that he and his partner decided to use interpreters. Stevens did not understand Spanish or know what Torrez said to defendant.

The final witness to appear for the motion to suppress evidence was

defendant, who spoke through an interpreter.[1] According to Sanchez, he was arrested by two officers who only asked him if his name was "Richard." He said his name was Angel Sanchez and was handcuffed, put in a squad car and taken to "a big building" where police officers asked him questions. He said he was not informed of his right to remain silent or to have a lawyer present. He further testified that he was not allowed to sleep, nor was he given food or water from the night he was arrested until the morning of his second day in the lockup.

Defendant further testified that he signed the consent form because he was told that he could not go home if he did not sign it. He did not understand it because it was in English. As to the interpreters, Sanchez testified that he did not understand them because he spoke "different" Spanish than they did. Defendant further stated that he had been in the United States for approximately two years at the time of his arrest and did not speak English at work because his boss speaks Spanish.

On cross-examination Sanchez read the Spanish summary of the consent form. He said that he understood the summary as giving police permission to search his apartment and he knowingly signed it, although he said he was not told that anything would be taken from his apartment. He also said he did not know that he had the right to refuse to sign the documents.

Following Sanchez' testimony and counsels' arguments the court ruled that the police officers had probable cause to take defendant into custody and remove items from his person and that defendant freely and knowingly consented to the search of his home. Accordingly, all evidence seized from Sanchez and his home was admissible.

*Motion to Suppress Confession*

Testimony and arguments on defendant's motion to suppress confession began on July 31, 1979, and was continued in January of 1980. In the interim defendant obtained a new attorney. Much of the testimony is repetitive of that which was offered on the motion to suppress evidence and it is not clear from the record what, if any, incriminating statements were made by defendant. The focus of the motion, apparently, was to establish that defendant's difficulties in understanding English precluded him from knowingly waiving his *Miranda* rights.

Assistant State's Attorney Dennis Dernbach testified on July 31, 1979, that he reported to Area 6 Homicide at approximately 2:30 p.m. on April 28, 1978, pursuant to Investigator Kline's request. Defendant was brought up from the lockup to meet Dernbach, who informed Sanchez of his rights after introducing himself as the State's Attorney. First, Dernbach

---

[1] We note from the record that on one occasion, defendant answered a question before the translator interpreted it for him.

read him the *Miranda* warnings in English and then had a community liaison person, Mr. Santena, translate the rights into Spanish. After defendant received the warnings he requested an attorney and further questioning ceased.

When the hearing on defendant's motion continued in January 1980, Investigator Grogman testified. When he had first spoken to defendant, Sanchez responded in English. He indicated he understood when Grogman read him the *Miranda* warnings. The investigator further testified that in a conversation at the police station, defendant spoke English.

Investigator Stevens also testified that he advised defendant of his *Miranda* rights, which defendant stated that he understood. Next, he gave Sanchez the search consent form, which, again, Sanchez said he understood and finally, Stevens brought in Tony Torrez to read the form in Spanish. Defendant then signed the form. Stevens also told Torrez to give Sanchez the *Miranda* warnings in Spanish, which he did, and defendant indicated his comprehension. Thereafter, the female interpreter, Alicia Rivera, was brought in to write a summary of the form in Spanish. After defendant signed it, he told Stevens, in English, that he wanted to talk to an attorney before talking to the police. Thereafter, Stevens and Kline took defendant from the interview room back to the lockup. While they were on the elevator, defendant said, in English, "Hey man, I've never, I only met Linda once, I never been to her apartment, I don't even know where she lives." Stevens further testified that when he first spoke to defendant and gave him his *Miranda* rights, defendant responded in English. The reason he brought in interpreters was to preclude Sanchez at a later date from asserting that he could not understand English.

Tony Torrez substantiated the testimony regarding his role as interpreter.

Defendant testified on his own behalf that he spoke little English and could not read it. He stated that he had not understood the *Miranda* warnings. He also said the police had spoken to him first on the elevator on the way back to the lockup. He further testified that he had an Illinois driver's license and was employed as a mechanic and driver at the time of his arrest. His friends were Latinos who conversed with him in Spanish.

The final defense witness was Rebecca Jamaica, a young woman who had a child by defendant and had maintained contact with him before and during his incarceration. She spoke fluent English and Spanish and testified that Sanchez spoke only a few very basic, small words on the rare occasions he spoke in English.

Following arguments the trial court denied the defense motion, finding that the officers had not faced problems communicating with defendant in English and had only used the Spanish-speaking translators

to insure that defendant would be fully informed of his rights and would not later claim that he did not understand. Further, the court noted that defendant's request for an attorney, after which questioning ceased, was an indication that he understood his rights.

## Trial

The trial of Angel Sanchez began on March 31, 1980. The first witness was the resident and manager of the victim's apartment building, who discovered the body at 8 p.m. on April 26, 1978, when he went to check on Linda Tremaine, at her mother's request. He testified that he had gone to bed at 10 p.m. on the night before the murder and he heard no loud or unusual noises.

Officer Frank Rodriquez testified that he went to Tremaine's apartment on April 26, 1978, after receiving a radio call. He saw a long knife by the bed and bloodstains on the pillows. He did not know when the apartment was sealed.

Investigator Grogman next testified regarding his investigation of the crime. He visited the scene of the murder at 9 p.m. on April 26, 1978. The following evening he and his partner interviewed Linda and Louis Turney at the Peanut Barrel Tavern and Cindy Madison at the Paradise Lounge. When Grogman returned to the Peanut Barrel Tavern Linda Turney identified defendant as Angel Sanchez. Grogman took Sanchez, who was wearing a woman's ring and wristwatch, into custody, gave him his *Miranda* warnings and told him he was investigating a murder. Grogman and his partner took defendant's fingerprints and photograph. Grogman returned to the Paradise Lounge to show Cindy Madison Sanchez' mugshot for her identification.

The victim's mother, Irene Fisher, testified that she saw her daughter for the last time at 3 p.m. on April 25, 1978. Linda Tremaine was married but living apart from her husband. On the 25th of April, Linda was wearing a gold wristwatch and a ring. Sometime in the afternoon on April 26, 1978, Mrs. Fisher called her daughter and received a busy signal. After repeated attempts to reach her by telephone, Mrs. Fisher asked the manager of her daughter's building to check on her. Later, she was informed of her daughter's death. On April 28, 1978, she talked with Investigator Stevens, who asked her about Linda's jewelry.

Investigator Stevens, a 10-year police department veteran, testified that in his investigation of the victim's death, he took the watch and ring from defendant and showed it to Mrs. Fisher, who identified the jewelry as her daughter's.

Stevens further testified regarding his interview of Sanchez and the sequence of events surrounding defendant's signing of the consent to

search form. At 4 p.m. on April 28, 1978, Stevens and other officers searched defendant's apartment and found stereo equipment, a small television, a woman's coat and, on the bed, a white sheet with red stains.

Returning to the victim's apartment, the investigators found three empty cardboard boxes with the same logo (Gran Prix Electronics) as the stereo equipment in the Sanchez apartment. A warranty card with the logo "Midland Television" was found on the floor next to the victim's bed. Sanchez' television was manufactured by Midland and its serial numbers matched those on the warranty card in the victim's room. Linda Tremaine's blood type matched the blood on the bed sheet found in Sanchez' apartment. Sanchez' fingerprints were on the television but not on the stereo. Linda Tremaine's fingerprints were not found on either item.

Following medical testimony regarding the cause of death, Cindy Madison testified. She described the events of April 26, 1978, when she saw defendant with Linda Tremaine between 2 and 3 a.m. and sold her wine for Sanchez.

Another witness, Lester Uhlich, then identified the ring and watch as jewelry that Linda Tremaine had worn on April 22, 1978, when he ate lunch with her.

A fingerprint examiner testified that defendant's fingerprints were found on the telephone receiver and also on the telephone cord that was wrapped around the victim's neck. Another print was found on the bottom of a saucer found in her living room.

A police investigator next testified regarding the physical evidence they took from the apartments of the victim and of defendant.

A forensic scientist for the police department next testified that he found traces of spermatozoa on the victim's vaginal smear. He also found traces of human blood on Sanchez' fingernail clippings. The State rested after introducing its exhibits into evidence.

Defendant's first witness was Rebecca Jamaica, who had known him since October 1977. She testified that the Spanish summary of the consent to search form does not indicate any constitutional rights or warnings.

Percy Martin, a doorman at the Sheridan Tap in the 4600s of North Sheridan testified that he knew Sanchez as a regular patron and saw him there 3-4 times between 8 p.m. and 4 a.m. on April 25-26, 1978.

The final witness was Sanchez himself. He testified that he met Linda Tremaine at the Peanut Barrel at 8:30 on the night of April 25, 1978. After a couple of drinks they left, went to her apartment and had sexual intercourse. He made a phone call from her apartment. Before he left, Linda cooked two eggs, which he ate from a saucer similar to the one on which police found his fingerprints. He left and went to the Sheridan Tap, where he later saw Linda again. She was drinking heavily and became concerned that she would lose her watch and ring so she gave Sanchez her

jewelry for safekeeping. In the early morning hours of April 26, 1978, he and Linda went to the Paradise Lounge to buy a bottle of wine. Linda paid for it and then the couple returned to the Sheridan Tap and stayed until closing time. As they walked toward Linda's apartment building they were confronted by "Tony," her fiance, who carried a large knife and said he wanted to kill Angel Sanchez. Sanchez then left and did not return to her apartment. He was searching for Linda to return her jewelry on the night of April 27 when he was arrested.

Sanchez further testified that he could speak little English. He identified the consent to search form that he had signed and the Spanish summary but emphasized that he did not understand the document and was never told of its meaning or that he had a right to refuse permission to search his apartment. He stated that the blood on the sheet found in his apartment was a woman acquaintance's menstrual discharge. He owned the television and stereo equipment found in his apartment and Linda did not give them to him. He had purchased them from two Puerto Ricans on the night before he visited Linda Tremaine's apartment.

Regarding his inability to communicate or understand English, Sanchez stated that in April of 1978 he did not know the English words for "search," "permission," "lawyer," "right," and "not." He speaks Spanish with his friends and although he was deficient in English he knew what the deceased "wanted" on the night of April 25. He also knew enough English to ask her for some food. He had obtained his Illinois driver's license by going to a driver's training school.

The defense rested following Sanchez' testimony. The State then offered some stipulated testimony in rebuttal. Investigator Grogman testified that on the night of defendant's arrest, at police headquarters, Sanchez said that he acquired the woman's jewelry from an Indian girl named Rose Marie. Further, the State introduced in evidence Sanchez' Illinois driver's license application, on which he had checked two boxes that indicated he could speak and read English.

Following the conference on jury instructions, both sides gave their closing arguments. Defendant objected to several comments made in the State's rebuttal argument, which we will discuss in the opinion portion of this decision. The jury returned a verdict of guilty on the counts of felony murder, murder, and armed robbery. After a bifurcated death penalty hearing the jury declined to sentence Sanchez to death. Thereafter, the judge heard post-trial motions and sentenced Sanchez to 60 years for murder and 30 years for armed robbery, to run concurrently.

OPINION

Defendant first contends that his warrantless arrest lacked probable cause and that therefore all evidence seized from his person and apart-

ment should have been suppressed as fruits of the illegal arrest. If an arrest is unlawful at its inception, it cannot be justified by the subsequent discovery of incriminating evidence. (*People v. Peak* (1963), 29 Ill. 2d 343, 194 N.E.2d 322.) To effectuate the protective policies of the fourth amendment items seized pursuant to an illegal arrest must be suppressed. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) In the pending case, therefore, the determining issue is the validity of defendant's arrest.

An arrest cannot be based on a police officer's "bare suspicion" that the suspected person has committed a crime (*People v. Peak*); however, an officer has probable cause to arrest if the facts and circumstances within his knowledge "are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense." (*People v. Robinson* (1976), 62 Ill. 2d 273, 276, 342 N.E.2d 356, 358.) Under this standard courts have observed that whether or not probable cause exists depends on the totality of circumstances known to the arresting officer at the time of arrest. Furthermore, the probable cause determination should not be unduly technical but instead must rely on probabilities measured by the practical considerations of everyday life. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280; accord, *People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228.) In assessing the reasonableness of police conduct it is necessary to consider the officer's duty to maintain order, prevent crime and apprehend criminals, often while acting on a quick appraisal of the information known to him. (*People v. McClinton* (1978), 59 Ill. App. 3d 168, 375 N.E.2d 1342.) Moreover, a reviewing court will not disturb the trial court's finding of probable cause unless it is manifestly erroneous (*People v. Clay*), and it is proper for the court, in reviewing a ruling on a motion to suppress, to consider evidence during trial which assists in establishing the legality of the arrest. *People v. Summers* (1981), 100 Ill. App. 3d 170, 426 N.E.2d 937.

■■ In light of these principles, and in viewing the testimony on the motions to suppress and at trial, we hold that the trial court's determination of the probable cause issue is not manifestly erroneous. At the time defendant was arrested on April 27, the police had been apprised of the following facts: the victim had been violently murdered in her apartment and the apartment was in disarray; two witnesses had observed defendant with the victim in the early morning hours of April 26; of these two, Linda Turney knew defendant's name and pointed him out to Investigator Grogman and Cindy Madison gave him a general description of defendant; at approximately 2 a.m. on April 26 the victim bought wine for defendant at the Paradise Lounge, which was located in her apartment building and the two left the lounge together; red wine was found in the

victim's apartment in a saucer; defendant was wearing a woman's ring and wristwatch when Investigator Grogman arrested him; and defendant was taken into custody at Sheridan and Leland, near the scene of the crime, on the day the body was discovered. While any one of these facts alone might not be sufficient to establish probable cause we believe that, taken together, they support the arresting officer's reasonable belief that defendant was the offender. The police were unaware of anyone other than defendant who had seen her alive after he left the Paradise Lounge with her at 2 a.m. on April 26. Moreover, the disordered state of her apartment could well suggest a robbery motive, which could have led Investigator Grogman to be especially alert to the jewelry that defendant was wearing when apprehended. When Linda Turney pointed out Sanchez, Grogman had to quickly appraise the information he knew then and act accordingly.

In another case, we upheld a determination that probable cause existed where the officers at time of arrest knew only that defendant's fingerprint was present on a crumpled cigarette package in the living room near the murder victim; there was no indication of forced entry and the suspect was known to the victim; and two other possible suspects' whereabouts on the evening in question had been ascertained. (*People v. Summers* (1981), 100 Ill. App. 3d 170, 426 N.E.2d 937.) In *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356, an off-duty officer saw two men in a high crime area looking around and walking fast, carrying a television set, a partly concealed shotgun and a bag of items. They told the officer that they were helping their sister move, but then fled when he attempted to summon help. Other officers later arrested defendants after receiving a call about "suspicious" men carrying a television set and a shotgun. The supreme court upheld the probable cause finding despite the dissenting judge's observation that at the time of the arrest the police did not even know that a burglary had been committed. *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356. See also *People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228 (probable cause existed to arrest defendant who had been living with the murdered victim for a month before her death, was last seen with her at 1:30 a.m. on the morning her body was discovered, 5½ hours later, police knew of no one else who saw her alive after defendant was with her, and defendant left for Ohio in the victim's car the same day of her death).

We conclude that defendant's arrest was based on probable cause and the trial court did not err in admitting the evidence taken from Sanchez' person, the victim's ring and watch, and Sanchez' fingerprints and photograph.

■■ Further, we find that the evidence recovered from Sanchez' apartment was admissible on the basis of his consent to search. Defendant

argues that his authorization to the police was not voluntarily given. After reviewing the evidence in the record, however, we reject this contention also. Without repeating the facts at great length we note that Investigators Grogman and Stevens testified that they had had no difficulties communicating with defendant, at least initially, in English, and defendant told them he understood when they advised him of his rights. As an added precaution, Spanish-speaking interpreters, at various times, also read him the *Miranda* rights. After defendant had read the consent to search form which indicates that consent may be withheld, Tony Torrez read it to him in Spanish. Alicia Rivera then translated a summary in Spanish so that Sanchez could clearly read that he was allowing police officers to enter his apartment. He signed both the English form and Spanish summary. Regarding his own and his female friend's testimony that he knew little English, it was the trial court's role to evaluate the witness' credibility. Furthermore, Sanchez' Illinois driver's license indicated that he spoke and read English. In light of the strong indications in the record that Sanchez actually understood English we reject the argument that he was not adequately apprised of his *Miranda* rights. Moreover, even assuming his English is inadequate, the record amply supports the inference that the police officer's use of interpreters, who informed him of his rights in Spanish, safeguarded his rights. Additionally, he admitted at trial that he understood what he was signing. Consequently, we reject the argument that his consent to search was involuntarily given because he did not know he had a choice of refusing to sign the form, or that he was told he could not go home until he did. It appears from the record that the trial court's finding on the consent issue is not against the manifest weight of the evidence.

Finally, defendant contends that he was deprived of a fair trial because of the prosecution's rebuttal closing argument. Defense counsel objected to the following remarks:

1. "Believe me, if I was in Ecuador today this wouldn't be happening."

2. "This interpreter here, here, he is a fine man, he has worked in this courtroom a number of times but he is a waste of your money during this trial, ladies and gentlemen."

3. "When you see these pictures you will see only animals kill in this way."

4. "But, unlike him, my parents weren't out killing people and impregnating sixteen year old girls."

The trial court sustained objections to the first three remarks and told the jury to disregard the remarks. Generally, the effects of objectionable remarks are said to be "cured" when objections are sustained and the jury

is instructed to disregard them. *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *cf. People v. Cepek* (1934), 357 Ill. 560, 192 N.E.2d 573 (trial court's sustaining of objections does not always cure prejudicial errors).

The first remark is vague and it does not appear to be prejudicial to defendant. The remark was made in the context of thanking the jury for doing their civic duty and telling them that "this is the only country where something like this trial can happen." Defendant had testified that he was from Ecuador. Although this remark was not relevant to the evidence, it is hardly so inflammatory as to require reversal. The second remark apparently was intended to imply that defendant did not need an interpreter because he understood English. While we agree that the comment was inappropriate, we do not find it to be of the type that would probably inflame the jury. The third remark came at the end of counsel's argument, and, while again it was not perhaps the best way to phrase the remark, we hardly think that the jury was unduly influenced by the reference to the way an "animal" kills when the nature of the killing was brutally evident to the jury from the testimony and exhibits.

■■ The final remark appears to be the most objectionable. Although counsel made the remark in apparent response to defense counsel's insinuation that the State's attorneys were· "insensitive" to the problems of people from other countries, we agree that the comment was improper. Nevertheless, the reference to counsel's parents' activities, while it may have been confusing because it makes no sense, was unlikely to have swayed the jury against defendant. Therefore, although the comments, taken together or separately, were not proper comments on the evidence, we do not find that they amount to reversible error. The jury was admonished as to the nonevidentiary effect of counsel's arguments, and the four remarks defendant singled out did not deprive defendant of a fair trial. See *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 383; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.

For the reasons herein discussed, we hold that defendant's arrest was based on probable cause, the search of his apartment was conducted pursuant to his voluntary consent, all evidence recovered from defendant and his apartment was consequently admissible, and the prosecution's closing argument in rebuttal did not deprive defendant of a fair trial. Therefore, we affirm the judgment of the trial court in its entirety.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.