THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDWARDO RIVERA *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 84—2258, 84—2740 cons.

Opinion filed June 17, 1986.—Rehearing denied July 15, 1986.

James J. Doherty, Public Defender, of Chicago (Marc Fogelman, Assistant Public Defender, of counsel), for appellant Edwardo Rivera.

Steven Clark and Michael Peletier, both of State Appellate Defender's Office, of Chicago, for appellant Pedro Muniz.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Timothy W. Heath, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Pedro Muniz and Edwardo Rivera, defendants-appellants herein, were charged by indictment with the offenses of murder and armed violence. These charges arose from the April 23, 1983, shooting death of William Concepcion at his residence in Chicago. The trial court

granted a defense motion to sever the prosecutions, resulting in simultaneous trials before two juries. Both defendants were ultimately convicted of murder, and received 30-year prison terms. These consolidated appeals followed.

The defendants have raised an aggregate of eight issues on appeal. Those common to both defendants are as follows: First, both men assert that they were prejudiced by the introduction of evidence revealing their gang associations. Second, each defendant claims that he was deprived of due process of law when the State was permitted to insinuate certain facts in the cross-examination of a key, exonerating defense witness without evidence to substantiate those claims. The defendants also assert that even assuming the State could substantiate those insinuations, the entire line of inquiry was too remote and speculative to establish bias on the part of that witness. Next, both men claim that the State's closing argument deprived them of a fair trial in a number of particulars. Finally, both defendants challenge the propriety of the 30-year sentences imposed upon them.

In addition to these common issues, Muniz asserts that his arrest was unsupported by probable cause, and that the trial court erred in failing to quash his arrest and suppress the resulting statements elicited from him. Rivera, meanwhile, asserts that error occurred when the trial court permitted the introduction of hearsay testimony which allegedly corroborated his confession. Rivera also claims that his right to confront and cross-examine witnesses was compromised when the State elicited the fact that Muniz had implicated him in the crime, when Muniz never was subject to examination.

BACKGROUND

Prior to trial, both defendants filed motions *in limine* to exclude any mention of their purported gang affiliations. The trial court denied those requests. Defendant Muniz, as noted, also moved the court to quash his arrest and suppress his statements. A hearing on that motion was held on July 6, 1984, after which the trial court denied Muniz' request. Evidence relevant to that ruling is incorporated with the trial testimony discussed below. The trial commenced on July 9, 1984.

Evette Reyes testified that she lived at 3225 West Pierce with William Concepcion, the victim. At approximately 6:30 p.m. on April 23, 1983, while at the apartment with Concepcion, Reyes heard a knock at the door. She went into the bedroom with her child, and Concepcion answered the door. While in the bedroom, Reyes heard four gunshots; she ran to the door and found Concepcion slumped

against the wall beside the door. Concepcion told Reyes that he had been shot by "two kids," aged about 15 to 17 years of age. Reyes first called her mother-in-law, and then called an ambulance. Her mother-in-law arrived before the ambulance; five minutes later, Emilio Detres arrived at the apartment.

William Concepcion died on April 24, 1983, from two gunshot wounds. The evidence indicated that the shots were fired at close range, and that they were not fired through the door itself. No fingerprints were found at the scene.

Emilio Detres was then called and testified before both juries, over Rivera's hearsay objections. Detres stated that on April 23, 1983, he was at a corner store making a phone call when he saw defendant Muniz. Muniz appeared "a little nervous" to Detres. Muniz was wearing an off-white "middy" or knee-length type sweater. Muniz then asked Detres if he knew that Mirabel Concepcion's brother had been shot. Detres said he did not know, and asked if it was Abraham Concepcion who had been shot. Muniz said no, that it was Billy (William Concepcion), and stated that he had been shot four times. Shortly thereafter, Detres left the store and went to the victim's house. The police and an ambulance were already there when Detres arrived.

At the house, Detres asked his aunt what had happened to Concepcion; his aunt asked how he found out so quickly. He told her about the conversation, then left the apartment. The next day, when he returned to the apartment after Concepcion's death, Detres was questioned by several police detectives investigating the offense. He related the same story, and later at the police station was shown a number of mug shots, including one of Muniz. Detres knew Muniz before the incident. He identified Muniz from the photo as the man he spoke to at the store.

Pablo Colon, who lived across the street from Concepcion, stated that he saw two youths go up to Concepcion's house in the early evening of April 23. As Colon walked toward his car, he heard the gunshots; as he went back to his home, he saw two boys, aged 14-16 and a few inches over five feet tall, running from Concepcion's. Colon was unable to see their faces, although he noted that one of the boys was wearing a light-colored jacket that came down to his knees. The other was attired in light-colored clothing, perhaps gray, but Colon was unable to tell for certain.

Officer Zaccardo spoke to both Colon and Dorothy Anderson, another area resident, after the shooting. He was unable to recall Colon's description; his report, however, included a composite descrip-

tion. One of the boys was described as a white hispanic 15-16 years of age, five feet six inches tall, wearing a jogging suit with a blue stripe on the pants. The other boy was also described as hispanic, 15-16 years of age, five feet six inches tall, who was wearing blue jeans and a white tee-shirt. Zaccardo broadcast these descriptions immediately.

Detective Richard Schak stated that he spoke to Colon on April 23, and received the following description: two hispanic males, 15-16 years of age, one in blue jeans and a white tee-shirt, one in a gray jogging suit with a blue stripe on the pants. It was also stipulated that Investigator William Schwartz would state that on April 26 Colon described one boy as 14-15 years old, five feet tall, wearing a white or light beige jacket.

Detective John Howe was the officer who spoke to Detres the day after the shooting. Howe was introduced to Detres by Mirabel, the victim's sister. Detres told Howe that Muniz was attired in a white, knee-length knit sweater; this latter point was not included in Howe's report.

Muniz was not home when Howe went there on April 24. Howe left his card with Muniz' mother, and requested that she have Muniz contact him. Muniz never did so. Howe testified that he believed Muniz met the description of the assailant, because he took the white tee-shirt in that description to be the off-white sweater Muniz wore when he spoke to Detres.

On April 27, Howe saw Muniz on the street with another man, later identified as Douglas Rodriguez. Howe told Muniz that he wanted to talk with him regarding the murder; according to Howe, Muniz stated he did not want to talk in front of others who were on the street. Muniz got in the back seat of the car, and Howe told him they could go to the station if Muniz wanted. Muniz said that was fine, because he wanted to get out of the neighborhood. Howe added that he felt that Muniz was free to leave, although he could not say whether he would have arrested Muniz had he left. Howe also stated that he had been looking for Muniz for three days, and he intended to take him to the station.

There was no mention in Howe's report about Muniz not wanting to talk on the street. Howe stated that he "arrested" Muniz while on the street, at about 8 p.m. Muniz was then taken to the police station and placed in an interrogation room; there was no conversation on the drive to the station.

Muniz stated that he was on the street with Rodriguez, and that the police came up to him and told him to get in the car. One of the officers grabbed him and threw him in the back seat. Muniz did not

talk to the officers on the street, and did not feel that he had a choice about going with the officers; rather, he felt that he had to accompany them.

After arriving at the station, Muniz was interrogated on four separate occasions by Detectives Curley and O'Shea. These officers arrived at the station at about 8:30 p.m. on April 27 and spoke to Howe and his partner, Officer O'Brien, before confronting Muniz. Muniz remained in custody in the interrogation room for 14½ hours, from 8:30 p.m. until 11 a.m. the following morning, at which time a written confession was obtained. During this detention, Muniz was not provided with a cot or bed to sleep on, although Curley stated that Muniz did appear to sleep during this period.

At 9:30 p.m. on the night of the arrest, Curley first spoke to Muniz. After advising Muniz of his rights, Curley informed him that the police had information indicating that Muniz had knowledge of Concepcion's murder. Muniz stated that he met Rivera on the night of the shooting at 6:50 p.m., and Rivera told him about Concepcion's slaying. Muniz also stated, when asked to recount his activities on April 23, that he had been with Rodriguez at a girlfriend's house the afternoon prior to the incident, and that he left there and went to his wife's home, arriving there at 6 p.m. and remaining there until approximately 1 a.m. The detectives then ended the first interrogation, and reviewed their files and Muniz' statement.

An hour and a half later, the officers confronted Muniz with alleged discrepancies in his statement. They then left Muniz alone again while they conferred with Officers Howe and O'Brien. At 11:20, they again confronted Muniz, this time telling him that they knew he was at the scene. Muniz then asserted that Rivera and an individual known as "Chico" shot the victim. Muniz claimed that these two had told him about the incident at 7:30, while they were on the streets. Curley and O'Shea again left the room to confer with Officers Howe and O'Brien, who then left the station to locate Rivera and Chico (identified as Julio Baez). These men were later found and brought to the station.

After statements had been obtained from Rivera and Baez, the detectives confronted Muniz again at 2:30 a.m. This time, Muniz stated that Rivera asked him to go with him on an errand, and that Muniz agreed to do so. They went to Concepcion's home and Rivera walked up the stairs. Seconds later, Muniz claimed to have heard two shots. Rivera ran out of the building and told him to leave, and both men ran off.

When the officers told Muniz that the ballistics report indicated

that four shots had been fired, and that Muniz himself had asserted that there were four shots earlier, Muniz agreed to "tell [the detectives] what happened, I'm not going to lie to you." Muniz then stated that he and Rivera were walking down the street when they were stopped by two men in a pickup truck, both of whom were senior Latin Kings. These men directed them to shoot Concepcion, who was allegedly dealing in drugs in an area claimed to be Latin King controlled, without payment to the gang. The two provided Muniz and Rivera with guns. Rivera and Muniz went to Concepcion's home, and when Concepcion opened the door, each fired two shots and then fled. Muniz also stated that both he and Rivera were Latin Kings.

At that point, Curley left to type an arrest report, and Muniz was taken to view photographs at the gang crimes unit. Muniz picked out one of the two senior Latin Kings who directed the slaying. After identifying certain homes that the two senior gang members frequented, Muniz was returned to the interview room at 4:45 a.m. on April 28, where he was handcuffed. The State's Attorney's office was eventually contacted at 8:15 a.m. It was at that time that Curley recalled seeing Muniz sleeping.

An assistant State's Attorney spoke to Curley, and then at 10 a.m. spoke to Muniz. Muniz was again admonished as to his rights, and then gave a written statement, substantially the same as the one given the detectives. This written statement was obtained at 10:50 a.m. on April 28th.

Rivera was arrested and brought to the station the evening of April 27, 1983. Curley stated before Rivera's jury that after a conversation with Muniz, he went to "look for other possible offenders in this crime." Rivera's objection to this testimony was overruled. At the station, Rivera was informed that he "had been named" as an offender in the killing. As to this testimony, defense objections were again overruled. Rivera then stated that he and a friend were walking through the area of the shooting when they saw a police car and an ambulance. Rivera remained in the area, and learned that Concepcion had been shot four times.

The next morning, the State's Attorney's office interviewed Rivera, who reiterated his earlier statement. Rivera was put in a lineup before Susie Rosario, a witness, who did not identify him.

At midnight of April 28, Detective William Kaupert interrogated Rivera. After Rivera denied any knowledge of the shooting, Kaupert told Rivera that Muniz had implicated him. A defense objection to this statement was sustained. Kaupert continued to confront Rivera with the evidence against him and Rivera ultimately acknowledged that he

agreed to be a lookout for Muniz, but asserted that he ran off when he heard the shots. After further interrogation, Rivera admitted his involvement in the killing.

The State's Attorney's office was called in, and obtained a written statement from Rivera. In that statement, Rivera admitted that he was a Latin King, as was Muniz. Rivera claimed that Muniz approached him and asked him if he wanted to get some extra money by robbing Concepcion. Rivera walked to the victim's house while Muniz drove up in a pickup truck. When Concepcion opened the door, Rivera saw that Muniz had a gun. Muniz shot Concepcion four times, and both men ran away. The State then rested its case.

The defendants called Susie Rosario. She stated that she lived next door to Concepcion. She described Concepcion as a friend she had known for four years. At about 6:30 p.m. on April 23, 1983, she saw a red pickup truck driving down Pierce Street towards Concepcion's house. Rosario went to her back porch to watch her son, who was playing there, and she saw the truck again, this time turning down an alley. Two of the truck's four occupants got out of the truck and walked past her; Rosario was able to see their faces as they came by. Rosario returned to her house, and heard four shots. As she looked out her window, she saw the two men who had exited the truck running from Concepcion's house. According to Rosario, neither of the defendants were involved.

The next day, Rosario spoke to the police. She asserted that she had not reported the incident earlier because she was in shock. The police took her to the station, where she reviewed photographs; she was unable to identify either man she saw. She was later asked to view a lineup, which included the defendants. Again, Rosario did not identify either of the accused. Rosario stated that one of the men she saw had curly, frosted, two-toned hair, and wore a beige sweater with a dark triangle design on it.

On cross-examination, Rosario denied that she was friends with Rivera's mother or that she had spoken to Rivera's mother before. Over repeated objections to this line of inquiry, Rosario denied that her husband "hung around" with members of the Latin King gang, that he was a senior Latin King himself, and denied that he supplied the gang with drugs. Rosario did acknowledge that her husband, William Lopez, had a prior drug conviction.

Detective Michael Herigodt testified that he went to the scene the day after the shooting to locate potential witnesses, and there spoke to Rosario. She described the two men she had seen as follows: one a light-skinned hispanic male with light-brown hair that had a frosty

look, 19 to 20 years old, five feet seven inches tall, wearing black pants and a beige sweater with a geometric design on it. The second man was medium-complexioned with ear length, combed-back hair, 18-19 years of age, wearing black pants and a white, cloth, waist-length jacket and armed with a revolver.

In rebuttal, the State called the victim's sister, Mirabel Concepcion. She stated that she had known Rivera since grammar school, and that she had seen Rivera's mother conversing with Rosario. Mirabel also stated that senior Latin Kings are the older members of the gang, and that Lopez associated with senior Latin Kings.

Prior to closing argument, both defendants moved to strike the testimony and cross-examination regarding Willie Lopez' membership in or relationship to the Latin Kings, asserting that there was no evidence to support such a relationship or the questioning regarding it. Counsel also moved to strike references to Lopez' alleged activities supplying drugs as lacking an evidentiary basis; finally, defendants moved that testimony regarding Lopez' prior conviction be striken as irrelevant. The trial court denied all these motions.

In closing, the State attacked Rosario's credibility, asserting that Rosario's husband was a "convicted dope peddler" and a senior Latin King himself. Numerous other objections were made to the State's closing argument as well as the rebuttal. The jury ultimately convicted both defendants of murder, and the trial court sentenced each to a 30-year prison term.

OPINION

As previously noted, each defendant sought to preclude the State from introducing evidence revealing or implying his street-gang associations. The trial court turned down these attempts, and that decision is asserted on appeal as reversible error. Rivera asserts that such references were utterly irrelevant to his case, which he claims was simply a bungled robbery attempt. Muniz concedes the relevance of gang affiliations to his case, but argues that the specific references made therein were error, as they revealed more than his mere gang association.

Both defendants cite this court's opinion in *People v. Parrott* (1976), 40 Ill. App. 3d 328, 352 N.E.2d 299, in support of their assertion that the references to gang membership prejudiced them before their respective juries. In *Parrott*, we noted the revulsion which attaches when an accused's street-gang membership is revealed at trial:

> "It is common knowledge that there is a deep, bitter and widespread prejudice against street gangs in every large metropoli-

tan area in America." (40 Ill. App. 3d 328, 331, 352 N.E.2d 299; see also *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840; *People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671.)

The State does not quarrel with this conclusion, but nonetheless maintains that the evidence relating to gangs was admissible at trial under the particular facts of the instant cases.

■ The touchstone consideration herein is whether or not the evidence concerning defendants' gang affiliation was relevant to the charges filed. (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840; *People v. Calderon* (1981), 98 Ill. App. 3d 657, 661, 424 N.E.2d 671.) Where the information is relevant, it is admissible despite the prejudice inuring to the accused from its disclosure. (*People v. Deacon* (1985), 130 Ill. App. 3d 280, 291, 473 N.E.2d 1354.) The probative value of the evidence outweighs the prejudicial impact. An accused may not insulate the trier of fact from his gang membership where it is relevant to a determination of the case, simply because prejudice attaches to that revelation.

■ The State's entire theory of the case revolved around the implication therein of the Latin Kings street gang. According to the State, William Concepcion, the decedent, was selling drugs in an area the gang claimed to control without paying "dues" for that activity. As a result, the gang's leaders dispatched defendants (both of whom acknowledged their gang membership in their statements) to execute Concepcion. Given this theory, it would be nigh on impossible to purge the trial completely of all mention of the gang. Under the State's theory, the gang was intimately involved both prior to the offense (providing the motive for the killing, assembling the characters, and giving them weapons) and afterwards (in providing allegedly false exonerating testimony for defendants). In light of the obvious relevance of defendants' Latin King affiliations, we cannot discern any error in the introduction of evidence relating to that fact. Moreover, in light of this conclusion, we cannot accept Muniz' assertion that references to the use of the "gang crimes" unit, to a gang-member mugbook, and to the proximity of other gang members to defendant when he was arrested, constituted reversible error. At worst, these references were cumulative to other evidence revealing the gang's involvement in the killing.

The next two issues are closely interwoven; both concern the propriety of the State's cross-examination of Susie Rosario. Ms. Rosario was a key defense witness, who professed to have seen the men who committed the murder, and who exonerated both Rivera and Muniz of

any involvement in the offense.

In line with its theory that the crime was gang-related, the State sought to impugn Rosario's credibility by portraying her as a tool of the Latin Kings. The State ascribed to the gang an intent to obtain an acquittal of defendants by fostering perjured testimony. Specifically, the State cross-examined Rosario about her husband, Willie Lopez, asking her if Lopez was a Latin King, whether he associated with senior Latin Kings, and whether he supplied the gang with drugs. The State assured the trial court that it would substantiate these allegations, and the court permitted the State's inquiry based on that assurance. The State failed to meet that representation when it did not produce evidence of Lopez' gang membership or drug involvement (beyond the aforementioned, undated conviction); yet, the State argued the existence of these factors in summation before the juries, asserting these allegations as proven facts undermining Rosario's credibility.

Each defendant has assailed this impeachment or Rosario as improper on dual grounds. First, assuming that this avenue of impeachment was a valid approach, both men assert that the State failed to produce evidence necessary to corroborate the assertions, resulting in proceeding compromised by innuendo and depriving them of a fair trial. Alternatively, assuming that there was substantiation of these insinuations, defendants assert that these matters were too remote and speculative to afford affirmative impeachment of Rosario's credibility. On either basis, defendants claim that they are entitled to a new trial.

■ We address first the issue of whether error occurred when the State asked Rosario leading questions with impeaching overtones without presenting any evidence to substantiate those implications. It has long been recognized as error for the State to ask a defense witness questions presuming facts not in evidence as a precursor to impeachment of that witness, unless the State has evidence to substantiate the inquiry. (*People v. Wallenberg* (1962), 24 Ill. 2d 350, 353, 181 N.E.2d 143.) "The asking of the leading question and the denial carry a harmful innuendo which is unsupported by any evidence." (*People v. Burbank* (1972), 53 Ill. 2d 261, 270, 291 N.E.2d 161.) The danger inherent in this situation is that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question, substituting this presumption for proof. This result cannot be countenanced, as it would inevitably lead to a "trial by insinuation and innuendo" rather than a trial by properly introduced evidence. (*People v. Morris* (1979), 79 Ill. App. 3d 318, 330, 398 N.E.2d 38.) We

cannot elevate insinuation to the dignity of artful and proper cross-examination. The facts of the instant case point out the dangers of the practice employed by the State at trial.

Here, the State's only remotely impeaching evidence along the lines suggested in the cross-examination of Rosario was the fact that Lopez had a prior drug conviction (the specifics of which were never elicited), and the fact that Mirabel Concepcion, the decedent's sister, had seen Lopez in the company of senior Latin Kings. From these rather narrow facts, the State drew inferences that Lopez earned a living for himself and Rosario through drug trafficking, and further that Lopez was himself a Latin King. We fail to discern how an undated and unspecified conviction on a drug related charge, standing alone, creates an inference (let alone substantiates an insinuation) that Lopez was the gang's current drug supplier. This inference simply does not reasonably follow from the admitted fact that he had at one time been convicted of a drug offense. Nor can we conclude, as the State would have us do, that because Mirabel Concepcion knew Lopez "to associate" with senior Latin Kings, Lopez was a senior Latin King himself. This inference ranges well beyond what may reasonably flow from the fact that he had been seen, in undescribed circumstances, with unnamed members of the gang. We have no doubt that countless persons would be surprised to hear themselves described as gang members because someone saw them in mere proximity to other known gang members.

The State seeks to circumvent the requirement that it substantiate its cross-examination by noting that before a party may introduce independent evidence concerning a witness' bias, it must first lay the foundation for the impeachment by giving the witness the opportunity to respond. (*People v. Woolridge* (1980), 91 Ill. App. 3d 298, 300, 414 N.E.2d 814.) Thus, the State suggests that the inquiry was mandated by the foundation requirement. This requirement, however, does not constitute a warrant for an unlimited fishing expedition for impeaching facts. Indeed, the State's conduct herein belies the claim that it was simply laying the foundation for introducing impeaching evidence of Rosario's associations. The State did not ask Rosario if her husband had "associated" with senior Latin Kings, or limit the inquiry to whether he had a prior drug conviction. Rather, the State asked questions sowing the seeds for claims that Lopez was a gang member, and a current drug supplier for the Latin Kings, the same gang which allegedly had an unsanctioned drug dealer murdered. Clearly, the questions asked bear only a limited resemblance to the facts the State was prepared to substantiate.

Even were we to assume that the State planned to substantiate the insinuations contained in the questions asked of Rosario (and we note that the State assured the trial court that it would), but was unable to do so, the argument made to the jury in summation belies such an innocent intent. The State informed the jury that it should "take a look at what [Rosario's] involvement is in terms of her husband." After reminding the jury that the gang controlled local drug trafficking, the State argued:

> "[W]e know that Suzy [sic] Rosario's husband, lo and behold, is a convicted dope peddler, and we know that Suzy [sic] Rosario's husband, lo and behold, is a senior member of the Latin Kings.
>
> * * *
>
> [The evidence] tells you that [Rosario is] hooked into this thing and her husband is hooked into things right up to his ears. There's no question as to what her bias is. She didn't tell you she works, she didn't tell you that her husband works. I'll tell you how they make their money. You can figure it out for yourself, I don't have to tell you how they make their money. She's admitted he's a convicted dope peddler."

The correlation between the insinuations of the State's questions and the argument offered to the jury betrays a calculated attempt to impeach Rosario by the insinuations themselves, rather than an innocent attempt to explore her bias. The State argued as fact that which it could not substantiate, after implying those facts to Rosario in cross-examination. This is precisely the danger the substantiation requirement was designed to deflect.

The harm of the insinuations contained in the State's interrogation of Rosario is patent. She was the key defense witness, and her credibility was the foundation of the defense case. As the State emphasized to the juries herein, the case was really quite simple: did the jury believe Rosario, or did it believe the State's witnesses. The verdict to be returned turned almost entirely around that consideration. Given the significance of Rosario's testimony, the State's argument based on facts it was unable to prove by direct evidence (and this after assuring the trial court that it would substantiate these claims) deprived the defense case of considerable persuasive power. We are not prepared to hold that the fact-finding process was uncompromised by these unsupported attacks on Rosario's credibility.

> "The State's interest in a criminal prosecution is not that it must win at all costs, but to assure that justice is done, and it is a prosecutor's duty as much to refrain from improper meth-

ods calculated to produce a conviction as it is to employ legitimate techniques to secure a just conviction, striking hard blows, but not foul ones." (*People v. Ray* (1984), 126 Ill. App. 3d 656, 664, 467 N.E.2d 1078.)

The questions and arguments described above bespeak more than a mere overzealousness on the part of the State; rather, these actions carry a quality of purposefulness in the way facts were insinuated in cross-examination and then asserted as true in summation. These "foul blows" cannot be countenanced consistent with the State's duty to assure a fair trial.

Moreover, even were we to find that the record provided sufficient inferential substantiation for the State's insinuations, we would still be constrained to find error. The State's showing of Rosario's bias was far too remote to provide the impeachment sought.

It is true, as the State suggests, that it is proper for a party to explore all the circumstances within a witness' knowledge that tends to explain, qualify, discredit or destroy that witness' direct testimony. (*People v. Williams* (1977), 66 Ill. 2d 478, 486, 363 N.E.2d 801.) A witness' credibility is always a material issue. (*People v. Adams* (1982), 106 Ill. App. 3d 467, 472, 435 N.E.2d 1203.) The fact that a party may explore a witness' bias, however, is not a license to engage in speculative attacks on that witness; the facts must be within the witness' knowledge, and cannot be so remote as to be mere conjecture. (See *People v. Bradford* (1979), 78 Ill. App. 3d 869, 877, 397 N.E.2d 863.) In the instant case, the attack on Rosario's credibility can only be deemed rank speculation.

The impeaching quality of the State's inquiry relies on a series of interdependent inferences. First, the State's impeachment depends on the assertion that Lopez was involved in drug trafficking with the Latin Kings. Assuming the validity of this inference, the State's claim necessarily requires the trier of fact to infer that because of this involvement, Lopez had an interest in seeing that neither Muniz nor Rivera was convicted of Concepcion's killing. Finally, Lopez' motivations would have to be imputed to Rosario, his wife, in order to provide impeachment of her testimony. Succinctly, we find this chain of inferences to be far too strained to indulge in. It follows that the trial court erred in permitting this conjectural assault on Rosario's credibility.

In light of the above disposition, it is unnecessary to resolve all the remaining errors asserted by defendants on appeal. We therefore confine our comments to those questions germane to retrial of the case.

Muniz claims that the trial court erred in denying his motion to quash his arrest and suppress the resulting confession. Muniz premises this claim on the assertion that he did not voluntarily go to the police station, but rather was arrested and brought there. The trial court, in denying the motion, concluded that Muniz voluntarily elected to accompany the officers to the station, obviating the requirement that the police possess probable cause in order to detain defendant and take him in for questioning. (See *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) The trial court did not address the question of when Muniz was actually arrested, or the issue of whether there was probable cause to support such an action.

■ We need not determine whether Muniz, in fact, acted voluntarily in going with Howe to the station, as we conclude that the police were possessed of sufficient facts to have probable cause for arrest. Probable cause exists if the facts and circumstances known to the officers when the arrest was made would cause a reasonable man to believe that an offense had been committed and that the accused was responsible. *People v. Creach* (1980), 79 Ill. 2d 96, 101, 402 N.E.2d 228; *People v. Summers* (1981), 100 Ill. App. 3d 170, 426 N.E.2d 937.

■ Here, when Howe stopped Muniz on the street, he knew that Muniz had spoken to Detres shortly after the murder. Howe further knew that Muniz stated that four shots had been fired, and that it was Billy Concepcion rather than some other occupant of the apartment building who had been slain. While the physical description of the assailants known by Howe at that time was insufficient, standing alone, to constitute probable cause, the knowledge of the crime demonstrated by Muniz' conversation with Detres meets the requirement that the police possess probable cause before an arrest is made. (See *People v. Clay* (1973), 55 Ill. 2d 501, 504-05, 304 N.E.2d 280 ("In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, and not legal technicians, act").) Here, it would be reasonable to conclude that Muniz was involved from his knowledge of the offense very shortly after its commission. It follows that no error occurred as a result of the trial court's denial of Muniz' motion or from the admission of his confession.

Rivera claims that he was deprived of his sixth amendment right to confrontation when the State elicited facts insinuating that Muniz had implicated him in the offense. (U.S. Const., amend. VI.) Specifically, Rivera cites Detective Curley's testimony and that of Detective

Kaupert. Curley stated that after speaking to Muniz, he left the station to look for other offenders, and then arrested Rivera; Curley also stated that he told Rivera that "he had been named as being one of the offenders" in the homicide. Kaupert testified that, after Rivera denied any involvement in the case, he told him that "Muniz had already said [Rivera] was there." A defense objection to this latter testimony was sustained.

The United States Supreme Court addressed this problem in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, concluding that the admission of a codefendant's confession implicating a defendant violates the sixth amendment's guarantee that the accused shall be able to confront witnesses against him, if that codefendant did not testify. Since that decision, cases have split on whether the defendant's rights were violated based on the admission of the fact that he was arrested following the interrogation of a codefendant. This split revolves around the substance of the testimony actually adduced. If only the fact that the police sought the defendant after conversing with codefendant is adduced, then reversal is not mandated. (See *People v. Dixon* (1982), 105 Ill. App. 3d 340, 434 N.E.2d 369; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659; *People v. Johnson* (1982), 104 Ill. App. 3d 572, 432 N.E.2d 1232.) If the substance of codefendant's statements have been elicited, however, then a violation of the guarantee has been established. (*People v. Campbell* (1983), 115 Ill. App. 3d 631, 450 N.E.2d 1318.) The key question therefore is whether the substance of Muniz' statements was placed before Rivera's jury.

■ Here, the only reference to the actual substance of Muniz' statements, beyond the fact that the officers sought Rivera after speaking with Muniz, was Kaupert's assertion that Muniz had stated that Rivera was there. The trial court sustained objections to that statement. This was sufficient to cure the error. The fact that Rivera was arrested after Muniz was interrogated was an admissible fact explaining the investigatory process.

> "[S]uch testimony was admissible in any event, even though the jury could reasonably infer therefrom that the accomplice implicated the defendant, since the substance of the conversation was not revealed, and an officer may properly testify concerning investigatory procedures." (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 397, 459 N.E.2d 1102.)

The substance of Muniz' confession did not reach Rivera's jury; they were merely apprised that Curley sought possible offenders after speaking to Muniz. Kaupert's statement, which did convey the import

of Muniz' statement, was excised from consideration. Under these circumstances, Rivera's right to confrontation was not compromised, and his claim to the contrary must lapse.

Rivera also claims that he was prejudiced by the admission of Detres' testimony. Detres stated that Muniz, shortly after the occurrence, told him that Concepcion had been shot. Rivera asserts that this testimony was hearsay which improperly corroborated his confession. The State claims that this testimony was not offered for the truth of the matter asserted, but rather to show that Muniz was in the vicinity of the offense at the time the crime was committed.

Testimony is hearsay if it is an out-of-court statement offered for the truth of the matter asserted. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738.) Where an out-of-court statement is offered not to prove the matter asserted, but rather to explain why the police investigation was conducted in the manner it was, then the testimony is not hearsay. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 529, 464 N.E.2d 659.) Here, it is indisputable that Detres' statement was the basis of Muniz' arrest, which in turn was the basis of Rivera's arrest. On this basis, it would appear that the State's contention that the statement was not offered for the truth of the matter asserted is accurate.

Moreover, Detres' testimony did not contain any references to Rivera. He was not mentioned by Detres, and his activities were not described. If the jury were to use the testimony as proof of the matters asserted, they would only conclude that Concepcion had been shot, that four shots were fired, and that Muniz knew these facts shortly after the occurrence. On these themes there was no dispute; Concepcion was shot, and he did die as a result. We cannot conclude that Rivera's defense was compromised as a result.

For the reasons set forth above, the judgments of the circuit court of Cook County are reversed, and the causes are remanded for new trials.

Reversed and remanded.

BILANDIC, P.J., and HARTMAN, J. concur.