2019 IL App (2d) 170091-U
No. 2-17-0091
Order filed November 14, 2019
Modified Upon Denial of Rehearing December 12, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-1066 |
| JAMIE C. KEY, | ) ) | Honorable Randy Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1   *Held*: Although the State erred in failing to perfect its impeachment of him, the error was harmless, as he used that failure to bolster his credibility, the State did not repeat its unsupported insinuation that he was not credible, and the evidence against him was strong.

¶ 2   Defendant, Jamie C. Key, was charged with various offenses related to the shooting death of his girlfriend, Savannah Johnson. At trial, defendant claimed that he was acting to defend himself when Johnson was killed. Following a jury trial, defendant was found guilty of, among other things, first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and aggravated domestic

battery (*id.* § 12-3.3). He was sentenced to consecutive prison terms of 50 years for first-degree murder and 5 years for aggravated domestic battery. On appeal, he argues that the trial court should have granted his motion for a mistrial, because, when the State failed to perfect its impeachment of him, the jury was left to infer that he was incredible, which cast serious doubt on his claim that he was acting to defend himself when Johnson was killed. Although we find that it was error for the State not to perfect the impeachment, we determine that the error was harmless. Accordingly, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Evidence presented at trial revealed that defendant and Johnson, who lived together with their two young children, had a very volatile relationship. Johnson would talk to her friends and write in her diary about her relationship with defendant, noting that she deeply loved defendant and feared him too. Johnson also expressed her deep love for defendant in text messages she sent defendant on the night she was killed. In reply, defendant belittled her and threatened to shoot her. This threat was not new. A few months before Johnson was killed, defendant called Johnson's mother and told her to come get Johnson and the couple's children before he shot them all. Complicating the couple's relationship was the fact that defendant was in a long-term romantic relationship with Johnson's sister, Hannah.

¶ 5      The volatile nature of defendant and Johnson's relationship became readily apparent on May 3, 2014. Early in the morning that day, Sabrina Robinson, a neighbor who knew neither defendant nor Johnson, heard a man and a woman arguing. Robinson then heard the woman yell " '[s]omebody please help me.' " Thirty minutes later, Robinson heard a gunshot and called the police.

¶ 6    Phillip Benjamin, defendant's stepfather who raised defendant for 20 years and has a criminal record, was privy to what transpired in the couple's home that morning. He testified that defendant called him at around 2:30 a.m. Defendant told Benjamin that he and Johnson were arguing again, and defendant asked Benjamin to pick him up at Hannah's house. Benjamin went to the couple's home. Benjamin testified that the home was in disarray.

¶ 7    Benjamin found Johnson outside. Johnson, who looked like she had been fighting, told Benjamin that defendant stabbed her, and she showed Benjamin a puncture wound to her chest. Johnson then got up and began stumbling toward the house.

¶ 8    At that point, defendant exited the home and told Benjamin that he was going to shoot him. Although Benjamin testified that he did not see anything in defendant's hand when defendant said this, he told the police that he saw a gun in defendant's hand. Benjamin identified himself and entered the home to check on the children.

¶ 9    While Benjamin was in the home, defendant came back inside. Defendant went into the couple's bedroom and began throwing and breaking things. Benjamin tried to calm defendant down, but he was unsuccessful, as defendant was "really upset."

¶ 10   Defendant went back outside, and Benjamin could hear defendant and Johnson fighting about defendant wanting to go to Hannah's house. Johnson, who was very upset and "got in [defendant's] face," insulted defendant, who is black, calling him a "mother fucking" "N" word. Defendant called Johnson names too, like " 'bitches.' " Benjamin, who was at the top of the stairs with the children, then saw defendant drag Johnson into the house and up the stairs. Johnson told defendant that she needed help, as she had been stabbed, and defendant told her that she was fine.

¶ 11   Once at the top of the stairs, defendant hit Johnson. Johnson fell down, got back up, and defendant punched her in the head. Johnson fell down again, she curled up into a ball with her

hands over her head, and defendant began kicking her. Benjamin pushed defendant away from Johnson and bent down to see if she was alright. Benjamin then heard a gunshot from behind him, where defendant was standing. Although Benjamin told the grand jury that he saw defendant fire the gun, he testified at trial that he was unsure about that. After she was shot, Johnson jumped up, took a few steps, and collapsed.

¶ 12    Defendant presented a different version of the events. He said that the fight started when Johnson grabbed a rifle stock and threw it at him. The rifle stock hit defendant in the forehead. Defendant ran toward Johnson, who was cussing at defendant, and punched her a couple of times. Johnson then ran into the kitchen and grabbed a "handful of knives." Defendant described the knives as "[l]ong knives" or "butchers" knives. Johnson yelled " '[c]ome on' " to defendant, and defendant grabbed her arm and said " '[p]ut the fucking knives down.' " Johnson complied and ran out of the house. Defendant called Benjamin to come get him, as he did not want to fight with Johnson anymore.

¶ 13    Defendant then went outside and started a heated conversation with Johnson. The couple began screaming and yelling at each other. Defendant attempted to calm Johnson down, but he failed.

¶ 14    Johnson then went back inside, and defendant followed her. The couple continued to fight verbally and physically. Defendant told Johnson that he was going to go to Hannah's house, and Johnson called defendant the "N" word and told him that he was "not fucking going anywhere." Defendant, who was getting "very, very angry," replied " '[b]itch, fuck you.' " Johnson then went into the couple's bedroom, and when she came out she had a gun in her hand.

¶ 15    Defendant walked toward Johnson, and she pointed the gun at him. Defendant grabbed the gun and continued to fight with Johnson. The couple was punching and kicking each other, and

defendant bit Johnson. Defendant testified that he was scared, and he "believe[d he was] trying to defend [himself]." Benjamin, who arrived at some point around this time, pulled the couple apart. Defendant stumbled backward, and the gun fired. Johnson was shot.

¶ 16    Defendant ran over to Johnson to help her, she got up, and then she collapsed. Defendant retrieved a towel to try to stop the bleeding, but he was unsuccessful. Defendant then went to get help at Hannah's and his mother's houses. Defendant never called an ambulance or the police.

¶ 17    On cross-examination, defendant was asked a number of questions about what he told the police when they interviewed him. Those questions were as follows:

"Q. But when you talked to the police, you didn't tell them that this was self-defense, did you?

A. What police are you talking to—talking about?

Q. You spoke to the detectives and gave a statement.

A. Which detectives?

Q. The detectives that you spoke to that you gave a statement to. You testified that you spoke to Detectives Gulley and Beets.

A. Correct.

Q. You never told them that this was self-defense, did you?

A. Yes.

Q. You did? You never told them that when you went back to your home, that [Johnson] threw anything at you, did you?

A. I believe I did.

Q. You never told them that [Johnson] grabbed a handful of knives and approached you, did you?

A. I'm not sure. I probably did.

Q. You never told them that you got hit on the forehead with the rifle stock, did you.

A. I probably did.

Q. You never told them that she went outside screaming, did you?

A. I don't recall. I'm not sure. Probably did.

Q. You never told them that [Johnson] pointed the gun at you in the bedroom, did you?

A. I didn't say anything about pointing a gun at me in the bedroom.

Q. You never told the detectives about giving [Johnson] knee strikes, did you?

A. Knee strikes? I don't recall. I probably did. Probably didn't use that exact terminology.

Q. You never told the detectives that the three of you were locked together for a couple of minutes, did you?

A. Not to my recollection. I'm not sure. I probably did.

Q. You never told the detectives that you went to your mother's house after the shooting, did you?

A. I'm not sure. I probably did.

Q. You never told the detectives that Kerry Hampton picked you up, did you?

A. I believe I did, but I'm not sure."

Defendant did not object to any of these questions when they were asked.

¶ 18    Hampton, defendant's friend, testified that defendant called him that morning and asked him if he could come over to Hampton's home. When defendant arrived at Hampton's, Hampton

noticed that defendant had some bruising on his nose. A picture taken of defendant soon after the incident showed some bruising on the bridge of defendant's nose. No other visible injuries related to the incident were visible in the photograph.

¶ 19    Officers who arrived at the scene observed that the home was in disarray. They found, among other things, a broken gun and clumps of hair on the floor and blood on the floor and the walls. They also saw that the injuries to Johnson were extensive. In addition to having blood coming out of her nose and behind her neck and back, Johnson had bruising on her neck and behind her ears. Mark Peters, a forensic pathologist, detailed all of the injuries Johnson sustained. He noted that Johnson sustained a number of external injuries, including a stab wound to the chest and a fresh bite mark.[1]

¶ 20    After the State rested, defendant objected to the fact that the State failed to perfect its impeachment of him. The State told the court that, even though it had one of the detectives available at trial to perfect its impeachment of defendant, it decided not to call the detective. The State then asked to reopen its case to perfect the impeachment. The court allowed the State to do so over defendant's objection.

¶ 21    To perfect the impeachment, the State sought to play the entire video of the interview between defendant and the two detectives. Defendant objected, and the court refused to allow the State to play the video.

---

[1] A diagram of Johnson's injuries revealed that she sustained multiple contusions and abrasions to her arms and legs and multiple contusions and swelling to her head. Of all of her injuries, only two contusions on her arms were labeled older contusions.

¶ 22    Because it could not play the video, the State called Beets to testify. The only things Beets remembered defendant telling him were that defendant and Johnson struggled and that Johnson retrieved a gun.

¶ 23    In closing argument, defendant highlighted several times the fact that he was not impeached. He argued that "he wasn't impeached because what he said was correct."

¶ 24    While the jury was deliberating, the court indicated that it wanted to address the fact that the State had not perfected its impeachment of defendant. The court questioned whether it should grant defendant's motion for a mistrial. While the parties were discussing what should be done, the court was told that the jury had reached its verdict, and the court denied the motion for a mistrial.

¶ 25    Defendant filed numerous posttrial motions. In these motions, he argued that the State's strategic decision not to perfect impeachment goaded him into moving for a mistrial. At a hearing on the motions, the State argued that it was precluded from perfecting the impeachment when defendant objected to the State playing the video of defendant's police interview. The court interjected that there was "absolutely no way [the State] can use a two-hour taped interview to perfect impeachment on 13 different questions."

¶ 26    Before ruling on the motions, the court reviewed the video. The court denied the motions, finding that, in light of the video, the State had a good-faith basis to ask the questions it did.[2] Specifically, the court noted that in the video the incident was characterized as an accident, and defendant never told the police that he acted in self-defense. Moreover, the court found that the

_____

[2] The video is not part of the record on appeal.

evidence against defendant was strong. Specifically, the court noted that Benjamin's testimony was consistent with the evidence while defendant's was not.

¶ 27   This timely appeal followed.

¶ 28                                II. ANALYSIS

¶ 29   At issue in this appeal is whether the trial court should have granted defendant's motion for a mistrial. "A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial." *People v. Redd*, 135 Ill. 2d 252, 323 (1990). "It is within the discretion of the circuit court to determine the propriety of declaring a mistrial." *Id.*

¶ 30   Defendant argues that the trial court should have granted his motion for a mistrial because, when the State failed to perfect its impeachment of him, the jury was left to infer, without proof, that he was incredible. That improperly weakened his claim that he was acting to defend himself when Johnson was shot.

¶ 31   The right to a fair trial includes the right to a verdict based on *evidence* presented at trial. *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). When the State fails to perfect the impeachment of a defendant, it allows the jury to convict a defendant based on something other than the evidence. *Berger v. United States*, 295 U.S. 78, 88 (1935).

¶ 32   Here, the State called defendant's credibility into question when it asked defendant if he never told the police various things. In response, defendant indicated that he either told the police those things or probably did. Although the State called Beets to testify about the conversation he had with defendant, Beets never testified that defendant in fact did not make the statements that he claimed he did. This was error.

¶ 33    The State must have a good-faith basis to cross-examine a defendant. *People v. McCoy*, 2016 IL App (1st) 130988, ¶ 57. The State should not ask a defendant leading questions that presume facts not in evidence as a precursor to impeaching the defendant unless the State has evidence to substantiate its inquiry. *People v. Rivera*, 145 Ill. App. 3d 609, 619 (1986). "The danger inherent in this situation is that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question, substituting this presumption for proof." *Id.* This cannot be allowed, as it would lead to a " 'trial by insinuation and innuendo' " rather than a trial based on properly admitted evidence. *Id.* (quoting *People v. Morris*, 79 Ill. App. 3d 318, 330 (1979)). Thus, if the State implies that a defendant made a statement that the defendant denies making, states that he cannot remember making, or otherwise equivocates about, the prior statement must be proven. *People v. Villegas*, 222 Ill. App. 3d 546, 555 (1991).

¶ 34    Clearly, the State should have perfected its impeachment of defendant by producing some evidence to prove that defendant never told the police the things that the State insinuated he did not. Despite the exclusion of the video, the State could have accomplished this by preparing either Beets or Gulley to testify after reviewing the video. We caution the State to act far more prudently in the future before asking these types of questions.

¶ 35    Defendant argues that, because the State made a tactical decision not to perfect the impeachment, *i.e.*, the State failed to act in good faith, he is automatically entitled to a new trial. We disagree. First, the fact that the video is not included in the record on appeal undercuts defendant's claim. The trial court, after reviewing the video, found that the State acted in good faith. Because nothing in the record supports a contrary conclusion, we must presume that the trial court's finding based on its review of the video was accurate. See *People v. Matthews*, 362 Ill. App. 3d 953, 966 (2005). Second, the cases to which the parties cite hold that, even if error arose

when the State failed to perfect the impeachment of a witness, a defendant is not entitled to relief if the error was harmless. See, *e.g.*, *People v. Enis*, 139 Ill. 2d 264, 298 (1990).

¶ 36    "The incomplete impeachment of a witness rises to the level of reversible error [only] when the allegedly unfounded insinuation, that the witness is incredulous, is substantial, repeated and definitely prejudicial." *People v. Amos*, 204 Ill. App. 3d 75, 82 (1990). Put another way, reversal is not required when there is positive evidence of the defendant's guilt, the comments were not a material factor in convicting the defendant, or the verdict would have been the same even if the error had not been made. *Villegas*, 222 Ill. App. 3d at 555. The defendant bears the burden of establishing that reversal is required. *Id.* at 554.

¶ 37    Here, we cannot conclude that reversal is required. First, although the failure to perfect the impeachment might at first blush appear prejudicial, defendant repeatedly asserted in closing argument that the reason why the State did not produce evidence establishing that he never made the statements he claimed he did is that, in fact, he did. We understand, as defendant points out, that he had no choice but to proceed that way. However, the fact remains that highlighting the State's failure strengthened defendant's credibility and, thus, his claim that he was, as he testified, acting to defend himself when Johnson was shot.

¶ 38    Second, although there were several impeachable statements that the State failed to perfect, the State did not repeat its insinuation that defendant never made the statements he claimed he did. As noted, defendant repeated the fact that he was never impeached, and he used that fact to his advantage.

¶ 39    Third, the positive evidence and inferences of defendant's guilt were strong. Specifically, the evidence revealed that before Johnson was killed she made it known that she both loved and feared defendant, who had threatened to kill her on other occasions. Text messages the couple

sent to each other on the night Johnson was killed confirmed that Johnson wanted nothing more than to be with defendant and that defendant did not respect Johnson and wanted her out of his life. Moreover, on the night Johnson was killed, a neighbor heard the couple fighting and Johnson calling out for help. Benjamin, who was a father to defendant for most of his life, testified that defendant threatened to shoot him, and Benjamin told the police that he saw a gun in defendant's hand. Benjamin also testified in detail that he observed defendant, who was very angry, beat Johnson before defendant shot her as she lay on the floor. An examination of her body after she was killed confirmed that she sustained numerous injuries, including a stab wound to her chest. In contrast, defendant, who suffered no injuries related to the incident other than a bruise to the bridge of his nose, never explained how Johnson sustained the stab wound and he admitted that he was very angry that night. Moreover, although defendant testified that he "believ[ed]" he grabbed the gun because he needed to defend himself, he testified that the gun fired accidentally when he stumbled backward. Rather than call the police or an ambulance, defendant left the home, which showed defendant's consciousness of guilt. See *People v. Moore*, 2015 IL App (1st) 140051, ¶ 26. Given all of this evidence, we must conclude that the verdict would have been the same even if the State had not made its improper insinuations.

¶ 40    We also note that, even if believed, defendant's statements that Johnson yelled racial slurs at him, threatened him with a "handful of knives" and fought him did not establish that he was acting to defend himself when Johnson was shot. Even defendant's own testimony revealed that he had many opportunities to leave the couple's home before Johnson was shot and that he was the one who repeatedly engaged Johnson when she repeatedly distanced herself from him. These facts alone, irrespective of the State's failure to perfect the impeachment of defendant, greatly

weakened the viability of defendant's claim that he acted to defend himself. See *People v. Monigan*, 97 Ill. App. 3d 885, 889 (1981).

¶ 41    Defendant claims that *Rivera* and *People v. Orr*, 45 Ill. App. 3d 660 (1977), support his contention that the State's failure to perfect impeachment was reversible error. In *Rivera*, the key defense witness in a murder case was cross-examined about her husband's affiliation with a gang. *Rivera*, 145 Ill. App. 3d at 616, 619. The State's theory was that the defendants were also affiliated with the gang and that the witness lied about who she saw at the scene of the shooting because of this connection. *Id.* The State failed to perfect its impeachment of the witness with evidence that her husband was in fact affiliated with the gang. *Id.* The defendants argued that this denied them a fair trial, as they were convicted based on the insinuation that the witness was not to be believed. *Id.* The appellate court agreed. *Id.* at 620. In finding that there was reversible error, the court noted that the case came down to whether the jury believed the key defense witness or the State's witnesses and that the State argued as fact in closing the insinuation it did not prove with evidence. *Id.* at 620-21.

¶ 42    In *Orr*, the victim of a shooting identified the defendant as the perpetrator. *Orr*, 45 Ill. App. 3d at 662. The defendant's mother and cousin testified that the defendant could not have shot the victim, as he was at home when the shooting occurred. *Id.* at 664. A defense witness who was with the defendant when the shooting occurred contradicted the victim's testimony and was asked on cross-examination if the defendant shot the victim to collect on a contract for the victim's death. *Id.* The defense witness said no. *Id.* The State never presented any evidence perfecting the impeachment of the defense witness. *Id.* The appellate court found that the failure to perfect the impeachment was reversible error. *Id.* at 667. In doing so, the court noted that this was a

"strange case," each side presented substantial evidence, and the State took no action to dispel the prejudice that might have resulted from failing to perfect the impeachment of the witness. *Id.*

¶ 43    We find neither *Rivera* nor *Orr* persuasive.  Unlike in *Rivera*, there was evidence other than defendant's and Benjamin's testimony for the jury to consider in assessing defendant's guilt. This included, but was not limited to, evidence of the injuries Johnson sustained, defendant's past threats, and his feelings about his relationship with Johnson.  Moreover, the State here did not argue as fact that defendant never told the police the things that he claimed he did.  This case is unlike *Orr* in that the impeachment of defendant did not go to motive, which the State does not have any obligation to prove (see *People v. Buck*, 361 Ill. App. 3d 923, 938 (2006)).  More importantly, this case is unlike *Orr* in that, as noted above, the State's evidence was much stronger than defendant's, and the State attempted to perfect the impeachment, although that attempt ultimately was fruitless (see *People v. Pasch*, 152 Ill. 2d 133, 186 (1992) (fairness of proceedings not undermined where State attempted to perfect impeachment of witness but was unsuccessful)).

¶ 44    In sum, we determine that the State should have perfected its impeachment of defendant via a more practical proposal than reviewing the entire tape. The State with some modicum of preparation could have recalled the officer and inquired about the instances of possible impeachment. Regardless of the trial court's opinion that the attempt was made in good faith, we believe that the State's suggested impeachment was unreasonable and insufficient. We determine that the State's attempt to perfect the impeachment was neither well planned and executed nor prejudicial.  Thus, we determine that the State's failure to perfect the impeachment was not reversible error.

¶ 45                                      III. CONCLUSION

¶ 46    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 47    Affirmed.