FOURTH DIVISION

No. 1-07-2406

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 04 CR 15743 |
| | ) | |
| MIKE ANGEL MALDONADO, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Defendant Mike Angel Maldonado was charged with first degree murder in the shooting death of Ricardo Hernandez. Defendant's first trial ended in a hung jury. Defendant was then tried by another jury and convicted. The jury also found that defendant personally discharged a firearm that proximately caused the death of Hernandez. Defendant was sentenced to 60 years in prison, 35 years for the murder charge and a mandatory 25 years added on for killing the victim with a firearm. Defendant raises three issues on appeal. First, defendant argues that he was denied a fair trial by the admission of irrelevant and inflammatory other-crimes evidence. Next, defendant contends that he was deprived of a fair trial because the State was permitted to bolster

the credibility of its only nonrecanting eyewitness with evidence of previous consistent statements. Finally, defendant argues that he was deprived of a fair trial because the repetitive introduction of prior statements made by a witness who recanted at trial, through multiple witnesses, violated the common law prohibition against prior consistent statements. For the reasons that follow, we reverse and remand for a new trial.

## BACKGROUND

Around 4 a.m. on May 22, 2004, 17-year-old Ricardo Hernandez was shot and killed outside his home. Defendant was subsequently arrested and charged with Hernandez's murder. His first trial resulted in a hung jury. At the first trial, the State filed a motion *in limine* to introduce gang evidence for the purpose of showing interest, bias or motive of a witness. Defendant filed a reply to the motion objecting to the introduction of any gang evidence, arguing that because there was no evidence that the murder was gang-related or gang-motivated, such evidence was far more prejudicial than probative and would make it impossible for defendant to receive a fair and impartial trial. At the hearing on the motion, the State said it only expected to introduce gang evidence relating to one witness, Angel Rodriguez, who was expected to change his story, in order to explain the motive for the change. The State said that the defendant's brother was also a member of the same gang, but it had not yet decided what to do about him because the motivations were "murkier." The court granted the motion, allowing evidence of gang membership for the limited purpose of showing bias or motive if Rodriguez should change his story at trial.

2

1-07-2406

At the second trial, the State reintroduced its motion *in limine* seeking the admission of common gang affiliation evidence for the purpose of showing interest, bias or motive if two of its witnesses, Rodriguez and Joe Maldonado, should offer testimony at trial that differed from their grand jury testimony or statements given to the assistant State's Attorney. Defendant renewed his objection. The court again granted the motion, allowing the evidence for the limited purpose of showing interest, motive and bias as to the testimony of Rodriguez and Joe Maldonado.

Carmen Hernandez, the victim's mother, testified that in the early morning hours of May 22, 2004, she awoke to the sound of gunshots. She ran downstairs to her son's room. When she saw that he was not in his room, she ran and opened the front door. Her son fell through the door as she opened it; his keys were in the door. She called to him but he did not answer. He had one eye open and one eye closed and his hands felt cold. She started screaming for help and opened the outer door to the porch, but did not see anyone outside. She then called 911 and went back inside the porch to look at her son. A young man she did not know ran up the steps to the porch and asked if her son was alright. He told her, "Don't let him sleep, wake him up," and nudged him with his foot. Hernandez told him to leave her son alone and asked him if he had seen anything. She testified that she was scared because she thought he might have been the person who shot her son. She then asked him to please leave them alone. The young man left and the police arrived shortly thereafter. Hernandez was screaming for an ambulance, and the police told her that her son was dead and they could not do anything for him.

Testimony at trial established that Hernandez lived on South Keeler, on a block with houses on one side of the street and Piotrowski Park on the other side. There is a dead end at the

3

south end of the street with some railroad tracks. Hernandez testified that a car was parked on the side of the street next to the park and that the young man who ran up on the porch came from the parked car. Hernandez said she saw a female sitting in the driver's seat of the car and that after she asked the young man to leave, he returned to the car. After the police arrived, these two individuals were standing outside and she told the police to talk to them because they must have seen something.

Officer Hernandez (no relation to the victim) and his partner responded to the call. Officer Hernandez testified that when they arrived at the scene, he observed a white sport utility vehicle (SUV) with Indiana license plates parked on the side of the street next to the park. A young man was standing on the sidewalk across the street from the SUV, near the victim's home. Officer Hernandez spoke with the young man and a young lady who stepped out of the parked car. He wrote down the names, addresses and phone numbers of both individuals. Officer Hernandez testified that he intended to give this information to the detective assigned to the case but acknowledged that he failed to do so. He informed both witnesses that they needed to remain at the scene until the detective could interview them. He testified that he did not remember the names he wrote down, but he identified photographs of Angel Rodriguez and Jillian Smith as the two people he spoke with that morning. He acknowledged that neither of the witnesses said they had seen the shooting and neither of them mentioned Mike Maldonado. He also stated that he did not know whether the witnesses actually waited to speak to the detective.

Detective Garcia testified that he was assigned to the case on May 22, 2004. At that time, he did not have the names of any suspects or witnesses. He interviewed the victim's mother on

4

June 1, 2004, and learned of the two potential witnesses for the first time. He then spoke to the officers who had originally responded to the call, but they were only able to give him physical descriptions of the two witnesses and a description of the vehicle they were in. On June 5, he received information that the female witness had been stopped by the police and he was able to obtain her name and address. He and his partner drove around the area where she lived several times but were unable to locate her. On the evening of June 11, 2004, they returned to the area and he saw a light-colored SUV with Indiana license plates. He stopped the vehicle and spoke with the driver, Jillian Smith. He told her why they were looking for her and asked her if she was willing to go with them to the police station. She agreed to go with them and he drove her to the station. Her SUV was brought to the station later by another officer.

Garcia and his partner interviewed Smith around 10 p.m. He testified that she initially told them that at the time the crime took place, she had just pulled up next to the park when she heard a woman screaming. She said that the other occupant in the vehicle got out to investigate. Garcia said that he told Smith she was not being truthful because she was parked directly across the street from where the crime occurred and she must have seen or heard something. Garcia testified that Smith got very quiet and then told them she was not being truthful. He said they spoke with Smith for an additional 90 minutes, and at the end of the conversation, he had the name of an additional witness, Angel Rodriguez, and a suspect, Mike Maldonado, known only to Smith as "Little Lazy." Smith then identified defendant in a photo array.

Garcia testified that around 6 or 7 the next morning, he asked Smith if she would stay at the station while they attempted to locate Rodriguez. He went to the address Smith provided

around 7:30 a.m. and spoke with Mercedes Rodriguez, Angel's mother. He asked if her son was at home and Angel came out and spoke with him. Garcia testified that he knew Angel was a juvenile after he spoke to Mercedes and Angel in their home. He informed Angel that he would like to speak to him about a murder he may have witnessed and asked him to go to the police station. Angel agreed and Garcia accompanied him to his bedroom while he got dressed. He said that he then informed Mercedes that her son was not in trouble but may have witnessed a murder. He invited Mercedes to accompany them to the station. She did not go with them, but came to the station between 8:30 and 9 that morning. Garcia explained to her that the interview could take a little time and she left the station.

Garcia testified that the initial interview with Angel took place shortly after they arrived at the station and Angel told him that he and a girl named Jill had driven to Piotrowski Park the night of the murder. He heard a lady screaming and thought she was getting robbed, so he got out of the vehicle to see if he could help her. Garcia then left the room to speak with Smith briefly. He returned for a second interview with Angel, and he testified that Angel gave a few more details, including that he tried to keep the victim awake. Garcia ended the interview and was getting ready to leave and let the day detectives take over, but was informed that Angel had given some more details so he returned to the interview room. The third interview lasted for 30 minutes and Angel identified defendant in a photo array. Garcia said that he did not accuse Angel of committing the murder and that he did not threaten him or shout at him.

Garcia then went to defendant's house with several other officers. Defendant opened the door and was taken into custody. Garcia testified that defendant's brother, Joe Maldonado, was

6

also in the house. Garcia stated that Joe gave the officers permission to search the first floor of the house and they found a 12-gauge shotgun but did not find a 9-millimeter handgun, the weapon used in the murder. Garcia testified that he knew Joe Maldonado and that Joe was a fellow member of the Two-Six gang, so he wanted to question him. Garcia asked Joe to accompany them back to the station and he agreed.

Garcia testified that he interviewed Joe at the station and asked him about the shotgun. Joe stated that he did not have any knowledge of it. He then asked Joe about the murder. Joe said that he heard someone had been killed but did not know anything about it. Garcia testified that in the meantime, defendant had been identified in a lineup by both Smith and Rodriguez. After the lineup, Garcia contacted the State's Attorney's office and shortly thereafter, Assistant State's Attorney Robertson arrived. Garcia and Robertson spoke with Joe Maldonado around 10:30 that evening. Garcia said Joe did not tell them anything different from what he originally told Garcia.

Garcia testified that Smith, Rodriguez and Joe Maldonado were fed, given water, and allowed to go to the bathroom either on their own or they would knock on the door of their interview room and someone would take them to the bathroom. Garcia said he asked Joe if he would be willing to stay longer and Joe said yes. Garcia and Robertson left the station. When Garcia returned the following day around 2 pm, Joe was still there.

Garcia and another detective interviewed Joe again for 30 minutes. This time, Garcia said Joe told a completely different story. Joe said he had been drinking with friends on the block where the murder occurred. Around 4 in the morning, he was walking northbound on that block,

on the west side of the street next to the park. He saw a male going up the stairs into a residence on the other side of the street. He then saw a vehicle pull up which he recognized as belonging to Playboy, a fellow Two-Sixer. He also saw his brother, Michael Maldonado, approach and talk to the person in the vehicle. He heard the person in the vehicle tell his brother to "get that punk." He heard gunshots and saw his brother shooting the young man he had seen going up the stairs. He then saw his brother run north away from the scene. Joe said that when he returned home, there was a light on in his brother's room but the door was locked. He asked his brother the next day why he shot "that kid," but his brother did not respond.

Garcia testified that he spoke with Robertson again, and Robertson returned to the station. Garcia said that he did not shout at Joe before Robertson arrived and that Joe did not complain of being cold or hungry or say that he wanted to leave. Robertson spoke with Joe again and took a handwritten statement from him. Joe was asked to remain at the station until the following day, when he would be taken before the grand jury to give the statement he had just given to Robertson. Joe agreed and testified before the grand jury the following day.

Garcia further testified that he attempted to find Playboy and learned that his name was Bobby Cordova. He and his partner attempted to locate Cordova on June 13 and informed the 10th District that they were looking for him. He never received any calls from the 10th District and testified that to the best of his knowledge, nobody was currently looking for Cordova.

Jillian Smith testified that she has 35 to 40 friends and acquaintances who are members of the Two-Six gang. She said that in February 2004, she was diagnosed with multiple sclerosis. She lost her vision and could not walk. She was treated with steroids, and in May 2004, her

vision was fine. She testified that at the time of the trial, she was having problems with her vision again. She stated that on the evening of May 21, 2004, she learned that an ex-boyfriend of hers named Pilo had been shot. She picked up three friends, Angel Rodriguez, Noel and Quiro, and they went to Mount Sinai Hospital to visit Pilo. She was driving her beige Blazer with Indiana plates. Smith testified that both Quiro and Rodriguez were members of the Two-Six gang. Smith could not recall what time they went to the hospital or how long they stayed, but she estimated they were there for a few hours. She left the hospital with Quiro and Rodriguez and drove to Cicero where she dropped Quiro off. Smith testified that to her knowledge, there was no alcohol in her car, nobody in the car was drinking alcohol at any time during the evening, and there was no cocaine in her car. Rodriguez asked to be dropped off at the house of one of his friends in Chicago. While Smith was driving back to the city, she noticed that her rings were missing. She started shouting at Rodriguez because she thought he or one of the other young men had taken them.

Smith testified that she drove down Keeler on the block where the victim lived and parked on the side of the street next to the park so that she could look for her rings because she was not going to let Rodriguez go until she found them. She said they were parked on the street for quite a while before anything happened, but that the only thing she did during that time was look for her rings and shout at Rodriguez. The streetlights were still on but the sky was starting to get light. She looked in her side mirror and noticed a young man walking home from somewhere on the opposite side of the street. She then looked in her rearview mirror and saw someone running toward the young man from behind. As the person who was running got closer, she saw his face

through the driver's side window. She noticed that he had a bald head with a long ponytail and recognized him as Little Lazy, the name by which she knew defendant. She then saw that he had a gun and said that as he got closer to the young man, he started shooting. Smith testified that the young man was still on the sidewalk when Little Lazy started shooting and that during the shooting she saw him going up the stairs of a house. When the shooting stopped, she saw Little Lazy run off toward the park and heard a woman screaming. Smith told Rodriguez to get out of the car and go see if the woman needed help.

Smith was still in her car when the police arrived on the scene. She said they asked her to get out of the car and took down her address and phone number. The officers asked her to wait until the detectives came so she and Rodriguez waited for over an hour and then the officers said they could go and that someone would be contacting them. On June 11, 2004, Smith testified that she was stopped by Garcia while she was driving down the street in her car. Garcia told her that they wanted to ask her some questions about the shooting, so she went to the police station in the squad car. Garcia and another officer came to talk to her about 20 minutes after they arrived at the station. Smith said that at first she told them she did not see anything because she did not want anybody coming after her. She said both officers left the room and Garcia returned by himself about 45 minutes later. In the second interview, she told Garcia that she had seen defendant shoot the victim. Garcia showed her a photo array and she identified a photo of defendant. She later identified defendant in a lineup.

Smith testified that she was at the police station for about four or five hours. On cross-examination, she stated that she did not remember if she was actually at the police station for over

24 hours and acknowledged that she wanted to go home but was not free to go home. She also said she did not remember whether the second interview in fact took place around 2 a.m., approximately eight hours after she arrived at the police station. Smith testified that her diagnosis of multiple sclerosis caused her to experience a certain amount of forgetfulness. She said that her fingers were itching after she first picked up Noel, Quiro and Rodriguez, so she took her rings off. She acknowledged that she found her rings two days after the shooting, tucked inside her steering wheel cover, where she had placed them when she took them off so that no one would get them.

Rodriguez testified that he used to be a member of the Two-Six gang and that he had been introduced to Smith by another Two-Six member. Rodriguez said that Smith picked him up the evening before the murder along with several other people and drove them to the hospital to visit another Two-Six gang member who had been shot. He said Smith had alcohol and cocaine with her when she first picked him up and they were drinking and sniffing cocaine all evening. Sometime before midnight, Smith, Rodriguez and Quiro left the hospital. Smith dropped Quiro off in Cicero, and then stopped at Rodriguez' home a few blocks away so he could pick up some CDs. Rodriguez testified that when he got back in the car, he drove because Smith was too drunk. While he was driving, Smith was giving him cocaine to sniff on a key. Rodriguez drove to Piotrowski Park. He described it as a park where Two-Six gang members hang out to play basketball, smoke and drink. He said he drove to Keeler and parked next to the park because it was a relaxing spot.

After they parked the car, Rodriguez testified that they were playing the music loud and were sniffing cocaine and drinking hard liquor. Rodriguez said he sniffed a line of cocaine off

Smith's breasts. After some time had gone by, Rodriguez got out of the car because Smith told him to look for her rings and that is when they heard someone screaming for help. Smith told him to go see where the voice was coming from. Someone turned a porch light on several houses away, so he ran over to the house and saw a young man down on the floor of the porch with blood around him and a woman crying. He said the young man's eyes were "shaky," which he described to mean between open and closed, so he told the woman to try and keep him awake and started tapping the young man's shoes with his own feet. He left the house and was standing on the sidewalk with Smith about two houses away when the police arrived. He testified that he told the police he did not hear or see the shooting and that he only heard a woman screaming. Rodriguez said the police asked both him and Smith for their names and addresses and then told them they could leave. He said Smith drove away from the scene and they went to her friend's house, where they continued to drink and sniff cocaine. He did not return to his home until later that night.

Around 7:30 a.m. on June 12, 2004, Rodriguez was at home sleeping when Chicago police detectives came to his house. He said the detectives told him to come with them and when he asked why, they said, "Just wait till we get to juvenile." He said he saw his mother when he came out to get dressed, but they would not let her get close to him. He was handcuffed and taken out to the unmarked police car. He noticed that the door on the first floor looked as if it had been broken, presumably by the detectives. He said he thought they took him to a juvenile center. There were a lot of offices and the detectives took him to a room on the second floor and handcuffed him to a metal bench in the room. Rodriguez said that they did not remove the

handcuffs until they moved him to another room sometime later. He said that they told him he was there because he killed someone.

Rodriguez said that the first three times he was interviewed by detectives he told them that he had neither seen nor heard the shooting and that he had not seen defendant that night. In the fourth interview, he said that the detective showed him a photo array and told him to pick out the person who had done the shooting. He selected a photo and the detective told him that was not the one he wanted him to choose and to select another photo. After selecting two more photos and being told by the detective that he had selected the wrong photo, Rodriguez testified that he finally selected defendant's photo. He also acknowledged that he gave a handwritten statement to the assistant State's Attorney in which he said he saw defendant running from the scene after shots were fired. He testified that the reason he told that story to the detective is because he was intimidated by the police shouting at him and trying to blame him for the murder. He said the assistant State's Attorney asked him to tell him what he told the police and he told the story the detective wanted him to tell because he was afraid that if he did not, he would be charged with the murder. Rodriguez testified that when he was taken to the lineup, a detective told him to choose the same person he had selected in the photo array.

Rodriguez confirmed that he had asked the assistant State's Attorney to relocate him and his family because he was scared of the Two-Six gang. He testified that in order to leave the Two-Six gang, a member has to go through what is known as a violation, a beat down from head to toe that lasts for three minutes. However, Rodriguez said he never got the beat down because the gang still tries to do something to you even if you survive the beat down. At this point in his

testimony, the court reminded the jury that any evidence regarding membership in a street gang was being offered for the limited purpose of showing the possible interest, motive or bias of the person testifying. Rodriguez's handwritten statement was read into the record. In the statement, Rodriguez said defendant was the only person he saw that night near where the shots were fired and that there was no one else in the immediate area.

Joe Maldonado, defendant's brother, testified that in the early morning hours of May 22, 2004, he stayed up with his girlfriend until about 3 a.m. He said his brother was in his bedroom next door playing loud music with friends. Joe said that because of the music, he did not actually fall asleep until 3:30 or 4 a.m. He acknowledged that he did not actually see his brother, but he was sure his brother would not leave the house while his friends were there.

On June 12, 2004, the police came to his house. He recognized Detective Garcia so he opened the door. He testified that Garcia slammed him up against the wall, then took him inside and threw him on the couch and started searching the house. He eventually figured out that they were looking for his brother, who was upstairs taking a shower. The officers brought a rifle or shotgun wrapped in a white towel and asked Joe who the gun belonged to. He told them it did not belong to him and he had never seen it before. Joe said he was handcuffed, taken outside and thrown into the detectives' car. The detectives drove him to the police station and placed him in a small room with concrete floors, no windows, and a steel bench with a rail behind it. The handcuffs were removed and he was left in the room until Garcia and another detective came to talk to him.

Joe said that the detectives were shouting and screaming in his face, telling him that he

knew something. He said they were grabbing him hard like they were about to hit him. He was kept in the room for a long time but he did not know what time it was. He said that he tried the door but it was locked and he banged on it to use the bathroom but they would not let him. Detectives came back to the room in groups of two maybe four or five times to talk to him. It was not until the third time they came back that the detectives told him his brother had committed a murder. Assistant State's Attorney Robertson eventually came in to talk to him and prepared a handwritten statement at 6 p.m. on June 13. Joe signed each page of the statement and initialed all changes. On June 14, Joe testified before the grand jury. The handwritten statement and grand jury testimony were both published in full to the jury at trial.

According to his grand jury testimony and the handwritten statement he signed, Joe told Robertson that he was out drinking and partying with his friends the night of the murder. A little after 4 a.m., Joe was walking home past Piotrowski Park, on the side of the street next to the park. He saw a young man walking toward one of the houses and then saw a car coming down the street. The car slowed down, and he heard the voice of a person he knew named Bob Cordova, also known as Playboy. He could hear Cordova saying things like, "Go ahead, do it, don't be a punk." In the handwritten statement, he said the car drove off and then he saw that Cordova had been talking to his brother, who was standing near the sidewalk just north of the house the young man was going into. He then heard some shots so he ducked down, but saw his brother shooting at the young man. In his grand jury testimony, Joe said that after he heard Cordova talking, he then heard some shouting and shooting and thought the shots were coming from the car, so he dropped down to the ground. In both statements he said that when he got

back up, he saw a person who looked like his brother running away. He saw a bald head and a little ponytail. He said it was dark, but he was pretty sure the person he saw was his brother. Joe did not see anyone else in the area. He ran through the park to get away from the scene after the shooting and saw some of his friends on another block so he stopped and had some beers with them. When he got home, the door to his brother's room was locked and the lights were off. He said that he tried to ask his brother about the shooting the next day, but did not get any response so he stopped asking.

At trial, Joe denied telling Robertson that he was in the area the night of the murder or that he saw his brother shoot anyone at that location. He acknowledged that he signed the handwritten statement prepared by Robertson. However, he said that the statement represented the words of Robertson and the detectives and the story they came up with. He said he was hungry, cold and tired. He had been kept in a small room with nothing in it but a metal bench for over 24 hours and during that time, he said, he was not allowed to use the restroom. He was wearing a sleeveless tee shirt and he was freezing. He said they made it seem like it was over for his brother. They showed him a picture of the victim's sister and another person and said those people were definite witnesses. Joe testified that Robertson told him his brother was "screwed" and was going to get 50 years if he did not sign the statement. He said that he told Robertson that the statement was all lies and Robertson got angry and told him just to put his "fricking" initials and signature down. Joe testified that he was tired and hungry and could not think straight, so he signed where he was told to sign and put his initials where he was told to put them.

When asked about his testimony before the grand jury, Joe said he did not recall being

asked those questions. He testified that he was taken to 26th and California in handcuffs to testify before the grand jury. They put him in a small office where he spoke with Assistant State's Attorney Phyllis Porcelli. Joe said that he asked Porcelli if he could trust her and if he could talk to her about the statement if it was not true. He said she told him that if the statement was not true, she would have to call the officers and he would have to tell them about it. After that, he said he did not tell her anything else because he was terrified of the police and was afraid they would take him back to the station and beat him. He said Porcelli told him to read the statement again and left him alone in the office. He estimated that he was alone for about an hour and kept reading the statement over and over.

Joe said that he told Robertson that he used to be a member of the Two-Six gang but his faction was dropped from the regular Two-Six organization because they just liked to party. The assistant State's Attorney asked Joe if he told Robertson that his brother was a member of the same gang. Defense counsel objected but Joe had already answered in the affirmative. The objection was sustained. Joe testified that Cordova had left the Two-Six gang and was a member of the MLD gang at the time of the shooting and that MLD and Two-Six are "at war" with each other. A member of Two-Six would not take an order from a member of MLD.

Joe was asked again later if his brother was a Two-Six member in 2004. He said he did not know if he was at that time. He was then asked, "You don't know if your brother was in a gang?" He answered, "I know he was before." The trial court then instructed the jury that any testimony about membership in a street gang is only to be considered for the very limited purpose of showing possible motive, bias or interest as to how a witness may be testifying.

17

Porcelli acknowledged that when Joe was brought in before the grand jury he was wearing a tank top. She testified that Joe never told her that the handwritten statement contained lies and that she never said she would call the detectives back. She also testified that she did not leave Joe alone in her office at any time before his grand jury testimony.

During closing arguments, the State said:

> "We don't know the why. You didn't hear during the course of this trial what the motive is for this killing, for this execution, and you are not going to receive an instruction from the Judge that says we have to prove what the motive is. Did the motive involve the Two-Six? Was it personal? Was Ricardo Hernandez even the intended target? Did Ricardo Hernandez even know what this was about?
>
> * * *
>
> In the world of the Two-Sixers, ladies and gentlemen, Mike Maldonado is probably a hero.***Does [the system] serve the public good or does it serve the agenda of the Two-Sixers? Despite witnesses testifying for the Two-Six play book, you now know the truth. Mike Maldonado executed Ricardo Hernandez."

Defendant retained private counsel to represent him at the postconviction proceedings. He filed a motion for a new trial, arguing, *inter alia*, that trial counsel was ineffective in representing defendant by failing to move to dismiss or even object to the State's mention of Joe Maldonado belonging to a gang, or any evidence of gang involvement. In the hearing on the motion, defense counsel said he wanted to supplement the motion to include one more point, or to clarify the point already made about gang evidence, namely, that the trial court erred in

18

granting the State's motion to admit gang evidence. Defense counsel argued that the evidence of gang involvement had nothing to do with the crime and the State took advantage of the evidence of gang membership to suggest that it could have been a motive and characterized the case as a "gang case." The motion for a new trial was denied. The trial court said:

> "I believe the evidence, the limited evidence that came in regarding gang involvement here, was appropriate, it was admitted for the proper purpose and I do not believe that it was so prejudicial to the defendant to change the outcome of the case in any way. It was relevant and it was probative, and not just – I do not believe in any way that the defendant was convicted only because there was evidence that he was a member of a gang."

This appeal follows.

## ANALYSIS

Defendant first contends that the trial court abused its discretion by admitting evidence that suggested that the offense was gang related when the State conceded that the offense was not gang related. The trial court ruled that the evidence was admissible only for purposes of impeachment if two of the witnesses should recant pretrial statements in which they implicated defendant. However, the trial court then permitted the State to elicit extensive evidence suggesting that the offense was, in fact, gang related, and to portray the offense as gang related in closing arguments.

The State responds that the evidence of gang membership was properly introduced to

19

explain why certain witnesses recanted their prior handwritten statements and grand jury testimony. The State argues that the prosecutor admitted during closing arguments that the motive was unknown, and that when gang membership was discussed in closing arguments, it was only to explain why witnesses changed their stories. Moreover, the State contends that this issue is waived because defense counsel did not object during trial and did not include it in his posttrial motion.

Defendant replies that an issue may be preserved for review by raising it in a motion *in limine* and also raising it in a posttrial motion. Because defense counsel filed a reply objecting to the State's motion *in limine* to admit gang evidence, and because this issue was, in fact, included in defendant's posttrial motion, this issue is not waived. However, if this court should conclude that this error was not sufficiently brought to the trial court's attention, defendant asks that it be reviewed as plain error because the evidence was closely balanced and the error denied defendant the right to a fair trial.

Our review of the record indicates that defendant filed a reply to the State's motion *in limine* to admit gang evidence, arguing that the evidence of any gang affiliation on the part of the defendant would make it impossible for defendant to receive a fair and impartial trial. Defendant further noted that there was no evidence that the murder was gang related or gang motivated. Defense counsel made only one objection during trial to a statement made by one of the witnesses regarding defendant's gang affiliation and did not object to any of the numerous references to gang affiliation or activity in the State's closing arguments.

Defendant's motion for a new trial filed by substitute defense counsel included a claim of

ineffective assistance of trial counsel for failure to object to any evidence of gang involvement. At the hearing on the motion, defendant clarified the point to include the admission of gang evidence generally, arguing that the evidence of gang involvement had nothing to do with the crime and that the State took advantage of the evidence of gang membership to suggest that it could have been a motive and to characterize the case as a "gang case."

Our supreme court has held that a defendant preserves an issue for appeal if (1) there has been an objection at trial or the issue has been raised in a motion *in limine*, and (2) the issue is also raised in the posttrial motion. *People v. Hudson*, 157 Ill. 2d 401, 434-35, 626 N.E.2d 161, 175 (1993); *People v. Boclair*, 129 Ill. 2d 458, 476, 544 N.E.2d 715, 723 (1989). Here, defendant preserved this issue when he raised it in both his reply to the State's motion *in limine* and in his posttrial motion. See *People v. Mason*, 274 Ill. App. 3d 715, 721-22, 653 N.E.2d 1371, 1375 (1995) (recognizing that some appellate cases require a party to contemporaneously object but concluding that if the issue is raised in a motion *in limine*, it is not waived if defendant fails to make a contemporaneous objection). See also *People v. Barajas*, 322 Ill. App. 3d 541, 553, 749 N.E.2d 1047, 1056 (2001) (holding that the issue was adequately preserved where defendant objected to testimony while the court was considering witness's qualification to testify as a gang expert and also filed a posttrial motion stating that the court erred in allowing the witness to testify as an expert).

Although we must follow the supreme court holding that raising an issue in a motion *in limine* is sufficient to preserve an issue as long as it is also raised in the posttrial motion, we note that attorneys should still be vigilant in objecting during trial. In the instant case, it is not clear

21

what tactical strategy defense counsel was pursuing by only objecting once to the introduction of gang membership evidence when such evidence was repeatedly introduced by the State for purposes that went well outside the limited purpose of impeaching two of its witnesses. We also note that the trial court has the ability, and indeed the responsibility, to enforce its orders when attorneys violate those orders. Here, although the trial court stated in its denial of defendant's motion for a new trial that the evidence of gang involvement was only admitted for the limited proper purpose, our review of the record discloses that was not the case. When the gang evidence was introduced for the limited purpose of impeaching two of the State's witnesses, the trial court followed it up by repeating the limiting instruction to the jury. However, on the numerous other occasions in which gang evidence was introduced through other witnesses, or improperly by the witnesses being impeached, both defense counsel and the court were primarily silent. Similarly, no objections were made during closing arguments when the State said it had no motive, but then improperly used the gang evidence to suggest that the crime was in fact gang motivated. However, because defendant did object to the introduction of this evidence both in his reply to the State's motion *in limine* and in his posttrial motion, we conclude that this issue was sufficiently preserved.

Even if defendant had not sufficiently preserved this issue, this court can review it as plain error. Under the plain error doctrine, this court may review an error that was not preserved when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the

fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). Our review of the record shows that the evidence adduced at trial was so closely balanced in this case that the error alone could have affected the outcome and thus the waiver rule does not apply.

The State presented no physical evidence linking defendant to the murder, nor did it present any evidence of a relationship or connection between defendant and the victim. No inculpatory statements by defendant were admitted. The State's entire case is based on the testimony of three eyewitnesses, two of whom claimed at trial that the statements they signed in the presence of the assistant State's Attorney were signed under duress after they were kept at the police station for several days. Moreover, the two eyewitnesses who were together give conflicting stories about what they were doing in the hours before the murder and the third eyewitness gives a conflicting account of what happened just before the shooting. Rodriguez said he and Smith had been drinking hard liquor and sniffing cocaine all night, while Smith said there was no alcohol or cocaine in the car and they were only parked in that location because she was looking for her rings. According to Joe Maldonado, he was walking down the street and saw a car stop next to defendant immediately before the shots were fired, but neither of the other eyewitnesses saw Joe Maldonado or the car, and both Smith and Rodriguez testified that nobody else was in the area at the time of the shooting.

The State argues that the evidence in this case was not closely balanced and contends that the attempts by both witnesses to change their stories were "so lame and obvious that they

23

actually strengthened the People's case." However, the record does not support this assertion. Rodriguez said he selected the wrong person from the photo lineup three times before he finally selected defendant and that he only signed the statement because he was afraid the State would charge him with the murder if he did not sign. The jury may not have found this explanation to be so "lame and obvious" when the evidence adduced at trial disclosed that Rodriguez was present at the scene and the victim's mother initially thought he may have been the one who shot her son.

The most problematic witness for the State is defendant's brother, who claims the detectives made up the story of what happened and he signed the statement because he was detained at the station for days in intolerable conditions and he was told there were witnesses who would testify that his brother did it. He said the detectives told him that his brother was going to go away for 50 years. The record supports Joe Maldonado's assertion that he was detained by the police for several days. If, as the State contends, the statement signed by Joe Maldonado was his own account of what happened the morning of the murder, the State's case is actually weakened because a crucial detail in Joe's account is missing from the account of the other two eyewitnesses. Smith did not mention seeing Joe Maldonado or the car allegedly driven by Cordova, and both she and Rodriguez claim that nobody but defendant was in the area at the time of the murder. Smith testified that she first saw the victim walking home in her side mirror and then saw defendant running up from behind in her rearview mirror on the opposite side of the street, but she apparently did not see Joe Maldonado walking toward her on the same side of the street. Smith saw defendant running away through the park immediately after the shooting, but she did not see Joe Maldonado, who said in his statement that he also ran through the park

24

immediately after the shooting. Most critically, Smith testified that she saw defendant running up behind the victim and then shooting him, while Joe Maldonado's account had a car stopping beside defendant near the victim's house and the driver saying something to defendant immediately before the shooting.

The State explained at closing that Smith and Rodriguez could not be expected to pay attention to every car that drove past them on the street, and that Cordova was already gone by the time Smith looked in her rearview mirror. Not only does this explanation ask the jury to assume without any supporting evidence that there was a fair amount of traffic on a dead-end residential street around 4 a.m., it also contradicts Joe Maldonado's statement regarding the timing and location of one particular car being present immediately before the shooting. In his statement, Joe Maldonado said that the car driven by Cordova stopped just north of the victim's house, he heard Cordova say something to his brother and the shooting happened immediately after this incident. If this statement is correct, then Smith would have seen Cordova's car because she was parked just north of the victim's house and she testified that she saw the victim walking down the street from behind her vehicle toward his house and then saw defendant running up from behind and shooting. Yet Smith testified that there was nobody else in the area at the time of the shooting. The record clearly supports defendant's argument that the evidence was closely balanced in this case. Moreover, a mistrial had to be declared in the first trial because of a hung jury. Therefore, because this issue was sufficiently preserved and because it involves plain error that could have affected the outcome in a case in which the evidence was closely balanced, we will consider it.

1-07-2406

Defendant contends that the trial court erred when it allowed the State to present extensive evidence that suggested the offense was gang related and to portray the offense as gang related in closing arguments. Defendant argues that where the State's theory that the offense was gang related is not sufficiently supported by the evidence, the only purpose behind suggesting that the offense was gang related is to unfairly prejudice the defendant. See *People v. Smith*, 141 Ill. 2d 40, 62, 565 N.E.2d 900, 909 (1990). Because the effect of this prejudicial evidence and argument deprived defendant of a fair trial, defendant is asking this court to reverse his conviction.

The State responds that evidence of gang membership was properly introduced to explain why certain witnesses recanted their prior handwritten statements and grand jury testimony. The State cites a number of cases in support of its argument that the gang evidence was relevant in this case. The State further contends that it never argued that this offense was gang related and specifically stated in closing that it did not have a motive for the crime and was not required to prove one. The State argues that when gang membership was discussed during closing arguments it was to explain why the witnesses changed their stories.

The State's arguments are lacking in merit. The State did not only bring up gang membership while questioning the two witnesses who changed their stories. Smith and Garcia were also asked questions about the Two-Six gang, and Garcia testified that the reason he thought Joe Maldonado knew something is because he was a fellow Two-Six member, implying that it was a gang related murder. Moreover, the State elicited gang related evidence from the two witnesses it was impeaching that went outside the limited scope of showing gang membership

26

to explain why they recanted. The statement given by Rodriguez to the State's Attorney was published to the jury in its entirety in which Rodriguez said that the victim lived in Two-Six territory and there were "a bunch of Two-Sixers standing around, busting out" just a block away from the victim's house shortly before the murder. Joe Maldonado's statement was also published to the jury in its entirety, including the portion in which he said he saw Cordova, a fellow gang member, stop next to defendant right before the shooting and tell defendant not to be a "punk." The statement also contained speculation by Joe that defendant did this because Cordova told him to do it.

While it is true that the State said in closing argument that it did not have a motive for the killing, it followed this statement by asking a series of questions suggesting possible motives, and the first question asked was, "Did the motive involve the Two-Six?" The State did correctly use the gang evidence in closing arguments to explain why the witnesses changed their stories, but did not stop there. The State asked the jury to remember what Joe Maldonado said about Cordova and that he heard Cordova say, "Get that punk," and then the shooting started. The State said, "Gang bangers like Mike Maldonado commit horrible crimes like this one." The State went on to tell the jury that in the world of the Two-Sixers defendant is probably a hero and said that the witnesses testified for the Two-Six play book. Finally, the State asked if the system serves the public good or the agenda of the Two-Sixers and told the jury that it now knew the truth, that defendant "executed" the victim. The State explained that it was using the word "execution" to describe the shooting because of the method that was used, namely, five shots to the back. At oral argument, the State claimed that the word "execution" does not necessarily mean it was a

gang motivated killing and that drive-by shootings are not always gang related.

The cases cited by the State in support of its arguments are inapposite. See, *e.g.*, *People v. Rivera*, 145 Ill. App. 3d 609, 495 N.E.2d 1088 (1986); *People v. Tolliver*, 347 Ill. App. 3d 203, 807 N.E.2d 524 (2004); *People v. Dixon*, 378 Ill. App. 3d 535, 882 N.E.2d 668 (2007); *People v. Thigpen*, 306 Ill. App. 3d 29, 713 N.E.2d 633 (1999). These cases all support the State's argument that evidence of gang membership is relevant and admissible for the limited purpose of explaining why witnesses changed their stories at trial. However, none of these cases address the issue of gang evidence being improperly used to suggest a motive where the State has conceded it has no evidence of motive, or to suggest that defendant committed the murder because he is a gang member.

Evidence of gang related activity is only admissible where there is sufficient proof that such activity is related to the crime charged. *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907. In the instant case, the State acknowledged that it had no proof the crime was gang related but yet it still published Joe Maldonado's uncorroborated statements about Cordova, statements he denied making at trial, and then used those statements in closing arguments to improperly suggest that the shooting was gang related and ordered by Cordova. In *Rivera*, the court held it was reversible error for the State, in its impeachment of a witness, to argue as fact something that it could not substantiate. *Rivera*, 145 Ill. App. 3d at 621-22, 495 N.E.2d at 1096-97. While the State is permitted wide latitude in closing argument, it is improper for the prosecutor to argue assumptions or facts not based upon evidence in the case or to present to the jury what amounts to his own testimony. *Smith*, 141 Ill. 2d at 60, 565 N.E.2d at 908. "Furthermore, it is improper

for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision." *Smith*, 141 Ill. 2d at 60, 565 N.E.2d at 907. Finally, a defendant cannot automatically be assumed to be guilty based on his membership in an undesirable group. *People v. Terry*, 312 Ill. App. 3d 984, 992, 728 N.E.2d 669, 676 (2000).

The State sought permission from the trial court to introduce evidence of gang membership for the limited purpose of impeaching two of its witnesses, and then improperly introduced additional gang-related evidence that had nothing to do with that limited purpose and the trial court did not step in to enforce its order. At the hearing on the motion *in limine* to introduce evidence of gang membership, the court said:

> "I don't think quite frankly that anyone is going to be taken by surprise, that somehow some type of gang activity might be afoot.\*\*\*

> I think there would already be a strong suspicion on the part of the jury that there was gang activity afoot, and I think that by trying to limit the purpose for which it is admitted by bringing that to the attention of the jury when the gang references come out, that this is being admitted for the limited purpose of showing interest, motive, or bias removes a good deal of any of the prejudice that might otherwise go to the defendant. I think the probative value outweighs it."

Yet the trial court allowed the State to present evidence and argument that went outside this limited purpose and allowed the State to repeatedly suggest the crime was gang-related. It is incumbent upon a trial court to enforce its own orders. The State used the improperly introduced

29

evidence about Cordova to remind the jury that one of the witnesses suggested the shooting was ordered by a member of the Two-Six gang. The State said defendant would be considered a hero by the Two-Six and that witnesses were testifying according to the Two-Six play book. The State asked the jury not to let the system serve the agenda of the Two-Six. Moreover, the State improperly used the evidence of gang membership when it stated, "Gang bangers like Mike Maldonado commit horrible crimes like this one."

The only effect of these statements was to "inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision." Because the evidence in this case was closely balanced, the admission of evidence that suggested the shooting was gang-related could have affected the outcome. Therefore, we hold that error in the admission of gang-related evidence that went outside the limited purpose of impeachment and improper argument by the prosecutor in light of this evidence entitles defendant to a new trial.

Although we are remanding for a new trial, we must address the remaining issues raised by defendant because they are likely to recur at trial. As an initial matter, the State argues that the remaining issues have been waived because defendant did not object at trial and did not raise these issues in his postconviction motion. The waiver doctrine is a limitation on parties and not on the jurisdiction of the reviewing court. *People v. Wheeler*, 392 Ill. App. 3d 303, 309, 912 N.E.2d 681, 687 (2009). Because we are remanding this matter for a third trial, in the interest of judicial economy we will consider the remaining issues.

Defendant's second contention relating to other-crimes evidence is that the trial court erred in admitting evidence that a shotgun was recovered from defendant's residence. The State

responds that the shotgun was relevant to the circumstances of Joe Maldonado's trip to the police station. We reject the State's argument. As defendant points out in his reply brief, the State's position is that Joe Maldonado accompanied them to the police station willingly, and the evidence adduced at trial established that the shotgun did not belong to Joe Maldonado. The murder weapon was not a shotgun. Joe Maldonado was not arrested or charged with any offense related to the shotgun. Therefore, the only reason for the State to introduce this evidence is to suggest to the jurors that if the shotgun did not belong to Joe Maldonado, it must belong to defendant, who lived in the same residence, and someone who possesses a shotgun is more likely to commit a murder than someone who does not. Although it is true that this evidence is highly prejudicial, it is not necessary for us to engage in a discussion of whether the prejudicial effect is outweighed by the probative value because this evidence is not relevant to or probative of any issue in the case and is thus inadmissible.

We now turn to defendant's contention that the trial court erred in allowing the State to bolster Smith's credibility by the introduction of prior consistent statements. Because Smith was the only eyewitness who identified defendant as the shooter and did not recant at trial, her credibility was critically important. Defendant argues that the importance of Smith's credibility to the jury's verdict is further demonstrated by the jury's request during deliberations for a copy of Smith's signed statement to the assistant State's Attorney. The State responds that evidence of Smith's prior consistent statements was admissible on direct examination to rebut the allegation of recent fabrication made by defendant in opening statements.

Evidence that a witness made a prior consistent statement is generally inadmissible for the

31

purpose of corroborating the trial testimony. *Terry*, 312 Ill. App. 3d at 995, 728 N.E.2d at 678. Such evidence unfairly enhances the credibility of the witness because a jury is more apt to believe something that is repeated. *Terry*, 312 Ill. App. 3d at 995, 728 N.E.2d at 678. An exception to this rule applies when it is suggested that the witness recently fabricated the testimony and the prior statement was made before the motive to fabricate arose. *People v. Cuadrado*, 214 Ill. 2d 79, 90, 824 N.E.2d 214, 221 (2005). Here, defense counsel suggested that the motive to fabricate arose while Smith was being detained for over 24 hours at the police station. Defense counsel pointed out that in her initial interviews with police, Smith said she did not see the shooting and it was only after being detained for a lengthy period of time that she made the statement to the assistant State's Attorney implicating defendant. For the recent fabrication exception to apply, defense counsel would need to suggest that the motive to fabricate arose *after* Smith gave her statement to the assistant State's Attorney and testified before the grand jury but *before* she testified at trial. However, defense counsel suggested only that Smith initially denied any knowledge but then later made inculpatory statements due to her lengthy detention. In this case, the prior consistent statements implicating defendant in the shooting were made after the alleged motive to fabricate arose; thus, the recent fabrication exception does not apply. Therefore, evidence of Smith's prior consistent statements is inadmissible. Because we are reversing on other grounds, we need not address defendant's contention that the erroneous admission of prior consistent statements is grounds for reversal.

Finally, defendant contends that the trial court erred in allowing the State to introduce more than one prior statement to impeach Joe Maldonado. Joe Maldonado made two prior

statements that were inconsistent with his trial testimony: (1) a handwritten statement prepared by Assistant State's Attorney Robertson and signed by Joe, and (2) his grand jury testimony. Defendant argues that while the admission of one statement that is inconsistent with a witness's trial testimony is proper, the introduction of multiple statements that are inconsistent with the trial testimony but consistent with each other creates the same bolstering effect that is prohibited by the rule against the introduction of prior consistent statements.

In *People v. Johnson*, 385 Ill. App. 3d 585, 898 N.E.2d 658 (2008), a different panel of this court rejected a similar argument. The *Johnson* court explained that the defendant in that case was confusing prior *consistent* statements with prior *inconsistent* statements. The court further explained that consistency is measured against the trial testimony, not against other statements that conflict with the trial testimony. *Johnson*, 385 Ill. App. 3d at 608, 898 N.E.2d at 679. We agree and hold that the introduction of more than one statement that is inconsistent with a witness's trial testimony, whether or not such statements are consistent with each other, is proper.

CONCLUSION

Because the State introduced gang evidence that went outside the scope of the trial court's ruling that such evidence was only admissible for the limited purpose of showing bias or motive involving two witnesses who recanted at trial, and improperly used this evidence in closing arguments to suggest the murder was gang related when there was no evidence to support this theory, defendant's conviction is reversed and this matter is remanded for a new trial. Evidence

of the shotgun recovered from defendant's home is inadmissible at the new trial. The State is also prohibited from using Smith's prior consistent statements to bolster her credibility at trial. Finally, the State is permitted to introduce more than one prior statement of a witness that is inconsistent with testimony given at trial.

Reversed and remanded with directions.

O'MARA FROSSARD, P.J., and O'BRIEN, J., concur.

1-07-2406

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

_____

THE PEOPLE OF THE STATE OF ILLINOIS,

     Plaintiff-Appellee,

v.

MIKE ANGEL MALDONADO,

     Defendant-Appellant.

_____

No. 1-07-2406

Appellate Court of Illinois
First District, Fourth Division

January 28, 2010

_____

JUSTICE GALLAGHER delivered the opinion of the court.

O'MARA FROSSARD, P.J., and O'BRIEN, J., concur.

_____

Appeal from the Circuit Court of Cook County.

Honorable James Michael Obbish, Judge Presiding.

_____

For APPELLANT, Office of the State Appellate Defender, Chicago, IL (Michael J. Pelletier, Patricia Unsinn, Jessica A. Hunter, of counsel)

For APPELLEE, Cook County State's Attorney, Chicago, IL (Anita Alvarez, James E. Fitzgerald, Peter Fischer, of counsel)